WAYNE R. KENDRICK,

        Plaintiff-Appellant,

v.

PENSKE TRANSPORTATION
SERVICES, INC.,

        Defendant-Appellee.

No. 99-3160

ORDER
Filed August 11, 2000

Before **EBEL**, **KELLY**, and **ELLISON**,[*] Circuit Judges.

On the court's own motion the opinion filed on August 8, 2000 is amended to include an additional citation on page 19 of the slip opinion, in the subsection titled "C. Pretext." The citation sentence which currently reads, " <u>Randle v. City of Aurora</u>, 69 F.3d 441, 451 (10th Cir. 1995)" is amended to read as follows:

> <u>Randle v. City of Aurora</u>, 69 F.3d 441, 451 (10th Cir. 1995); <u>see also</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, –U.S.–, 120 S. Ct. 2097, 2109 (2000) (holding that "a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability" under the ADEA).

---

*Honorable James O. Ellison, Senior District Court Judge, United States District Court for the Northern District of Oklahoma, sitting by designation.

A copy of the amended opinion is attached.

Entered for the Court
Patrick Fisher, Clerk of Court


By:   Keith Nelson
       Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 8 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

WAYNE R. KENDRICK,

      Plaintiff-Appellant,

v.

PENSKE TRANSPORTATION
SERVICES, INC.,

      Defendant-Appellee.

No. 99-3160

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 98-CV-2289)**

---

Charles S. Scott, Jr., Shawnee, Kansas, for Plaintiff-Appellant.

J. Randall Coffey (Von E. Hays with him on the brief), of Bioff, Singer &
Finucane, LLP, Kansas City, Missouri, for Defendant-Appellee.

---

Before **EBEL, KELLY,** and **ELLISON**[*], Circuit Judges.

---

**EBEL**, Circuit Judge.

---

    *Honorable James O. Ellison, Senior District Court Judge, United States District
Court for the Northern District of Oklahoma, sitting by designation.

Plaintiff-Appellant Wayne R. Kendrick ("Kendrick") was formerly an employee of Defendant-Appellee Penske Transportation Services, Inc. ("Penske"). Penske terminated Kendrick from his position as a Penske truck driver in March 1997. Kendrick brought an action in United States District Court for the District of Kansas pursuant to 42 U.S.C. § 1981 alleging discriminatory discharge on the basis of race and retaliation for the filing of various complaints with management and for the filing of a union grievance while an employee at Penske. The district court granted summary judgment for Penske. Kendrick appeals the judgment. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM the judgment of the district court.

## BACKGROUND

Kendrick, a black man, was hired as a truck driver for Penske in 1995.[1] On March 8, 1997, Kendrick was driving his truck through the gate of the Penske facility when Richard Tirrell, Penske Safety Supervisor and Driver Recruiter, signaled Kendrick to stop. Todd George, Penske Logistics Center Manager, and Dan Levine, Penske Logistics Center Manager, were standing beside Tirrell. After Kendrick stopped, Tirrell told Kendrick that he was driving too fast. Kendrick told Tirrell that it was impossible he was speeding because he had just

---

[1]Because this case was decided on summary judgment, we assume the facts most favorable to Kendrick, the non-moving party, to the extent there is a dispute of fact.

- 2 -

entered the gate when Tirrell stopped him. Tirrell then said, "You were speeding in the parking lot and you got to slow down." Kendrick drove off following the exchange.

As he drove away, Kendrick received a call from Frank Godley, the dispatcher, to report to the dispatcher's office. When he arrived at the dispatcher's office, Tirrell was inside with Godley. Kendrick asked Godley what the problem was, and Tirrell answered, "They want to see you [Kendrick] in the front office." Kendrick again asked what the problem was and Tirrell repeated that Kendrick needed to go up front. When Kendrick asked again what the problem was, Tirrell approached Kendrick and said, in a hostile tone, "They want to see you up front now." Tirrell was standing "face-to-face" with Kendrick and prompted Kendrick to "do it, do it" as if he were trying to provoke Kendrick into a physical confrontation. Kendrick walked away and Tirrell yelled after him, "That's it, you're fired." Kendrick responded by swearing at Tirrell.

After leaving the dispatcher's office, Kendrick met Ken Hill, the union steward. Kendrick told Hill that he was leaving because he had been fired. Hill told Kendrick to wait and go with him to the front office. About twenty minutes later, Levine, Tirrell, Kendrick, and Hill met together at the front office. At the meeting, Tirrell gave his version of the events that occurred during his encounter with Kendrick at the dispatcher's office. Tirrell stated that Kendrick had charged

at him and pushed him and then verbally abused him.[2]  Although Levine asked

Kendrick to give his version of the story at the meeting, Kendrick declined to do

so.  At the conclusion of the meeting, Levine suspended Kendrick without pay

pending an investigation.

On Monday March 10, Levine contacted Clyde Cash, Penske's Regional

Human Resources Manager, who is also black, concerning the March 8 incident.

Levine told Cash that he, George, and Tirrell observed Kendrick speeding at the

---

[2]Kendrick stated in his affidavit, dated March 25, 1999, and attached to his Response to Defendant's Motion for Summary Judgment, that Tirrell did not "say that I bumped him or threatened him" during the meeting.  The affidavit contradicts Kendrick's earlier deposition testimony of January 20, 1999, in which he stated that Tirrell said at the meeting that Kendrick "charged him and pushed him and cursed him out."  In Bohn v. Park City Group, Inc., 94 F.3d 1457, 1463 (10th Cir. 1996), this court found that an affidavit that contradicts earlier deposition testimony should not be considered.  In Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986), however, this court found that an affidavit that contradicts earlier sworn testimony should only be disregarded if it "constitutes an attempt to create a sham fact issue."  To the extent that these cases recite different standards, Franks controls because it predates Bohn.  See Haynes v. Williams, 88 F.3d 898, 900 n.4 (10th Cir. 1996) ("[W]hen faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom.").  Even under the more lenient standard set forth in Franks, however, we must disregard Kendrick's later, contradictory statement in this case because it appears to be an attempt to create a sham issue.  Kendrick's March 25 affidavit is not based on evidence that was unavailable to him at the time of the deposition.  See Franks, 796 F.2d at 1237 (noting that whether the affiant had access to the pertinent evidence at the time of his earlier testimony is relevant to whether a sham fact issue exists).  In addition, the affidavit does not appear to be an attempt to clarify confusing testimony given during the deposition.  See id. (noting attempt by affidavit to explain confusion in earlier testimony is relevant to whether a sham fact issue exists).

Penske terminal and that Levine advised Tirrell to give Kendrick a warning letter. Levine also advised Cash that Tirrell later reported to him that Kendrick verbally and physically abused him when he tried to give Kendrick the warning letter. Levine informed Cash that Tirrell had indicated that Kendrick had cursed at Tirrell and bumped him with his chest and asked, "Do you want a piece of me?" Levine also told Cash that he had held a meeting with Kendrick, Tirrell, Hill, George, and Craig Clark to address the incident. Levine informed Cash that Kendrick had declined to give his own version of the events at the meeting. Levine provided Cash with sworn statements by Tirrell and Levine recounting the events of March 8. Based on what Levine told Cash about the verbal and physical abuse by Kendrick toward Tirrell and Kendrick's refusal to respond to or deny Tirrell's version of the conduct, Cash instructed Levine to terminate Kendrick's employment.

On March 26, 1997, Kendrick received two letters from Levine on behalf of Penske. The first was dated March 8 and informed him that he was suspended. The second was dated March 10 and informed him that he was being terminated because his actions constituted gross insubordination. The envelopes for both letters were postmarked March 12, 1997. After Kendrick was fired, Penske hired two black drivers.

Kendrick prepared a union grievance concerning the March 8 suspension on March 12, 1997. Hill and Kendrick both signed the grievance, and it was ultimately delivered to Penske. Penske denied the grievance on March 31, 1997.

Kendrick brought an action in federal district court for the District of Kansas against Penske alleging violations of 42 U.S.C. § 2000e ("Title VII") and 42 U.S.C. § 1981, as well as various state law claims. As relevant to this appeal, Kendrick specifically alleged: (1) Penske terminated him in violation of Title VII and § 1981; (2) Penske retaliated against him in violation of Title VII and § 1981 for protesting against Penske's discriminatory practices; and (3) Penske retaliated against him in violation of Kansas law for filing a union grievance.

The district court dismissed the Title VII claims on the ground that Kendrick had failed to exhaust his administrative remedies and granted summary judgment for Kendrick on the state law retaliation claim because Kendrick did not establish causation. Kendrick does not allege any error on appeal in connection with either of these determinations. Turning to the § 1981 discrimination claim, the district court found that Kendrick had put forth a prima facie case although, as we shall address shortly, it used an erroneous prima facie standard that required Kendrick to compare his situation to that of nonprotected status employees at Penske. The district court then concluded that Penske had articulated a racially-neutral explanation for terminating Kendrick and that Kendrick had failed to show

pretext. Thus, the district court entered summary judgment for Penske on the discrimination claim. Finally, the court also granted summary judgment for Penske on the § 1981 retaliation claims after finding that Kendrick had failed to show causation. On appeal, Kendrick argues that the district court erred in granting summary judgment for Penske on the § 1981 discriminatory discharge claim and the § 1981 retaliation claims.[3]

## DISCUSSION

"We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court." Simms v. Oklahoma, 165 F.3d 1321, 1326 (10th Cir. 1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Simms, 165 F.3d at 1326.

---

[3]The district court only considered Kendrick's claim of retaliation based on his filing of the March 12 union grievance as a state law claim. On appeal, Kendrick asserts a § 1981 retaliation claim, but not a state law claim, in connection with this grievance. Because our review of the record indicates that Kendrick asserted a § 1981 retaliation claim based on the filing of the grievance before the district court, we will consider the merits of this claim.

- 7 -

## I. § 1981 Discrimination Claim

A plaintiff alleging discrimination on the basis of race may prove intentional discrimination through either direct evidence of discrimination (e.g., oral or written statements on the part of a defendant showing a discriminatory motivation) or indirect (i.e., circumstantial) evidence of discrimination. See Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1207 (10th Cir. 1999); Elmore v. Capstan, Inc., 58 F.3d 525, 529 (10th Cir. 1995). Kendrick offers no direct evidence of discrimination. We must therefore determine if there is sufficient indirect evidence of discrimination for Kendrick to survive summary judgment.

The Supreme Court set forth the framework for assessing circumstantial evidence of discrimination in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). "While McDonnell Douglas involved a Title VII claim for failure to hire, the analytical framework it pioneered applies equally to claims brought pursuant to section 1981."[4] Perry v. Woodward, 199

---

[4]A plaintiff who alleges discriminatory discharge on the basis of race pursuant to Title VII, 42 U.S.C. § 1983, or § 1981 would have to establish the same elements in order to make out a prima facie case under the McDonnell Douglas burden-shifting analysis. See Drake v. City of Fort Collins, 927 F.2d 1156, 1162 (10th Cir. 1991); see also St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 n.1, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (presuming that the McDonnell Douglas framework applies to race-discrimination-in-employment claims brought pursuant to § 1983); Randle v. City of Aurora, 69 F.3d 441, 450 (10th Cir. 1995) (explaining that the McDonnell Douglas burden-shifting analysis applies to discrimination claims brought pursuant to Title VII, § 1983, and §

(continued...)

F.3d 1126, 1135 (10th Cir. 1999); see also Patterson v. McLean Credit Union, 491 U.S. 164, 186, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989).

Under the McDonnell Douglas framework, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." McDonnell Douglas, 411 U.S. at 802. Once the plaintiff has established a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its employment action. See id. at 802. If the defendant makes this showing, the plaintiff must then show that the defendant's justification is pretextual. See id. at 804. Importantly, the three-part McDonnell Douglas burden-shifting analysis is limited to the summary judgment context. Once there has been "a full trial on the merits, the sequential analytical model adopted from McDonnell Douglas . . . drops out and we are left with the single overarching issue whether plaintiff adduced sufficient evidence to warrant a jury's determination that adverse employment action was taken against" the plaintiff because of his or her protected status. Fallis v. Kerr-McGee Corp., 944 F.2d 743, 744 (10th Cir. 1991); see also Postal Serv. Bd.of Governors v. Aikens, 460 U.S. 711, 714-15, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983). Because

<hr>

[4](...continued)
1981). In this opinion, this court therefore discusses all relevant Title VII, § 1983, and § 1981 cases decided by this court in addressing the appropriate formulation of the prima facie case in the discriminatory discharge context.

this case was decided on summary judgment, we review the district court's

application of <u>McDonnell Douglas</u>.

## A. Prima Facie Case

The district court found that Kendrick established a prima facie case of race

discrimination. We agree with the district court's finding, although for different

reasons.

### 1. Elements of the Prima Facie Case

In <u>McDonnell Douglas</u>, the Supreme Court enumerated the elements

required in order for a plaintiff to establish a prima facie case in the failure to

hire context. These are: (i) plaintiff belongs to a protected class; (ii) plaintiff

"applied and was qualified for a job for which the employer was seeking

applicants"; (iii) despite being qualified, the plaintiff was rejected; and (iv) after

plaintiff's rejection, "the position remained open and the employer continued to

seek applicants from persons of [plaintiff's] qualifications." <u>McDonnell Douglas</u>,

411 U.S. at 802.

Significantly, the Supreme Court did not indicate in <u>McDonnell Douglas</u>

that a plaintiff is required to show that the defendant hired someone outside of the

protected class in order to make out a prima facie case.[5] <u>See</u> <u>Perry</u>, 199 F.3d at

---

[5]Decisions of this circuit have, on occasion, suggested in dicta that a plaintiff must show that a person outside of the protected class was hired to fill

(continued...)

1136 n.6.  In <u>International Brotherhood of Teamsters v. United States</u>, 431 U.S. 324, 358 n.44, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977), the Supreme Court explained some of the policy reasons underlying its formulation of the <u>McDonnell Douglas</u> prima facie case:

> The <u>McDonnell Douglas</u> case involved an individual complainant seeking to prove one instance of unlawful discrimination.  An employer's isolated decision to reject an applicant who belongs to a racial minority does not show that the decision was racially based.  Although the <u>McDonnell Douglas</u> formula does not require direct proof of discrimination, it does demand that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.  Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one.

> The Court recognized in <u>McDonnell Douglas</u> that although the articulation

of the plaintiff's prima facie test might vary somewhat depending on the context of the claim and the nature of the adverse employment action alleged, <u>McDonnell Douglas</u>, 411 U.S. at 802, the essential purpose served by a prima facie test

---

[5](...continued)
the position in cases where discrimination in hiring was alleged.  <u>See</u> <u>Bullington v. United Air Lines, Inc.</u>, 186 F.3d 1301, 1315-16 (10th Cir. 1999) (stating in dicta that plaintiff must show she was "treated less favorably than others not in the protected class" in order to make out a prima facie case of discrimination in hiring); <u>EEOC v. Wiltel, Inc.</u>, 81 F.3d 1508, 1515 (10th Cir. 1996) (indicating in dicta that a plaintiff must show that the defendant "hired other persons possessing [plaintiff's] qualifications who were not members of her protected class" as part of the prima facie case).  <u>McDonnell Douglas</u>, however, does not provide support for these formulations of the prima facie case.

remains the same. The "prima facie case serves . . . [to] eliminate[] the most common nondiscriminatory reasons for the plaintiff's rejection." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253-54, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred "under circumstances which give rise to an inference of unlawful discrimination."[6] Id. at 253. "As the very name 'prima facie case' suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a legally mandatory, rebuttable presumption." O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 311-12, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996) (citation and quotations omitted).

---

[6]Relying on this language, this court has, on occasion, recited a more general test for determining if a plaintiff has established a prima facie case of discriminatory discharge. See, e.g., Martin v. Nannie & the Newborns, Inc., 3 F.3d 1410, 1416-17 (10th Cir. 1993) (requiring plaintiff to show: (1) she belongs to a protected class; (2) she was qualified for her job; and (3) she was terminated under circumstances giving rise to an inference of discrimination). Collapsing the four-part prima facie case of McDonnell Douglas into a three-part test may occasionally be helpful when addressing discrimination claims that either do not fall into any of the traditional categories (e.g., hiring or discharge) or present unusual circumstances. But ordinarily, more structure and guidance can be found in the traditional four prongs of the McDonnell Douglas prima facie test. Those four factors, if shown, do "give rise to an inference of discrimination" according to the Supreme Court, and thus satisfy the more generalized third factor expressed in Martin v. Nannie and the Newborns.

The Supreme Court has never addressed the question of whether comparison to a person outside of the protected class is required as part of the fourth-prong showing of plaintiff's prima facie case in discriminatory discharge cases. See St. Mary's Honor Center, 509 U.S. at 527 n.1 (Souter, J., dissenting) ("The majority . . . mentions that [the plaintiff's] position was filled by a white male. This court has not directly addressed the question of whether the personal characteristics of someone chosen to replace a Title VII plaintiff are material, and that issue is not before us today.")

This circuit's earliest discriminatory discharge cases all adopted the four-part prima facie test as articulated in McDonnell Douglas. That is, the fourth prong only required the plaintiff to show that his or her job was not eliminated after the discharge. None of our earliest cases required that the replacement employee be a member of a nonprotected class as part of the plaintiff's case, nor indeed was any comparison to nonprotected employees required as part of a prima facie case. See Carlile v. South Routt Sch. Dist., 739 F.2d 1496, 1500 (10th Cir. 1984) (Title VII); Crawford v. Northeastern Oklahoma State Univ., 713 F.2d 586, 588 (10th Cir. 1983) (Title VII); Trotter v. Todd, 719 F.2d 346, 349 (10th Cir. 1983) (Title VII; demotion claim); Williams v. Colorado Springs, Colo., Sch. Dist. # 11, 641 F.2d 835, 843 (10th Cir. 1981) (Title VII; nonrenewal of employment contract claim); Lujan v. State of New Mexico Health & Soc. Servs.

Dept., 624 F.2d 968, 970 (10th Cir. 1980) (Title VII); <u>Ray v. Safeway Stores</u>, 614 F.2d 729, 730 (10th Cir. 1980); <u>EEOC v. University of N.M.</u>, 504 F.2d 1296, 1305 (10th Cir. 1974) (Title VII).

Some confusion regarding the fourth prong of the plaintiff's prima facie case in a discharge situation crept into our nomenclature in later cases where, occasionally, we would articulate the fourth prong of the prima facie case as requiring a plaintiff to show that the replacement employee was of nonprotected status. However, the language in most of these cases may be characterized as dicta. See <u>Aramburu v. The Boeing Co.</u>, 112 F.3d 1398, 1403 (10th Cir. 1997) (Title VII; § 1981); <u>Elmore v. Capstan, Inc.</u>, 58 F.3d 525, 529 (10th Cir. 1995) (Title VII); <u>Murray v. City of Sapulpa</u>, 45 F.3d 1417, 1420 (10th Cir. 1995) (Title VII); <u>Cole v. Ruidoso Mun. Sch.</u>, 43 F.3d 1373, 1380 (10th Cir. 1994) (Title VII); <u>EEOC v. Flasher Co., Inc.</u>, 986 F.2d 1312, 1316 (10th Cir. 1992) (Title VII); <u>McAlester v. United Air Lines, Inc.</u>, 851 F.2d 1249, 1260 (10th Cir. 1988) (§ 1981); <u>Carino v. University of Okla. Bd. of Regents</u>, 750 F.2d 815, 818 (10th Cir. 1984) (Title VII); <u>Whatley v. Skaggs Cos., Inc.</u>, 707 F.2d 1129, 1135 (10th Cir. 1983) (Title VII; § 1981). The language in these cases regarding the formulation of the fourth prong of the plaintiff's prima facie case may be dismissed as dicta for one of the following four reasons: either (1) this court assumed that plaintiff had established a prima facie case without deciding the issue; (2) evidence was

presented by the plaintiff that his or her replacement was of nonprotected status and thus the necessity of making such a showing was not an issue; (3) the case went to trial[7]; or (4) this court decided that plaintiff had failed to establish a different prong of the prima facie case.

In Allen v. Denver Public School Board, 928 F.2d 978, 985 (10th Cir. 1991), a Title VII case, the district court required a plaintiff alleging wrongful termination to show as part of a prima facie case that "[n]onminorities in the same or similar situations were not disciplined the same or similarly." This court affirmed the district court's decision to dismiss the plaintiff's claim for her failure to establish a prima facie case by making this showing. See id. at 985-86. Allen's holding, however, should be disapproved as inconsistent with our earlier precedent which does not require the replacement employee to be of nonprotected status. See Haynes v. Williams, 88 F.3d 898, 900 n.4 (10th Cir. 1996) ("[W]hen faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom."). As noted earlier, many of our earlier cases required as the fourth prong of the plaintiff's prima facie case only that the job was not eliminated after the plaintiff's discharge without requiring that the replacement employee be of a nonprotected status. See, for

---

[7]As discussed above, the McDonnell Douglas burden-shifting analysis drops away entirely once the case has gone to trial.

example, <u>Ray v. Safeway Stores</u>, a Title VII case, where this court held that a plaintiff who was discharged for insubordination made out a prima facie case by showing that "after his discharge the job remained available." <u>Ray</u>, 614 F.2d at 730; <u>see</u> <u>also</u> <u>Crawford</u>, 713 F.2d at 588; <u>Williams</u>, 641 F.2d at 843. In fact, this court observed in <u>Brown v. Parker-Hannifin Corp.</u>, 746 F.2d 1407, 1410 n.3 (10th Cir. 1984), that some other courts had adopted prima facie tests stricter than that set forth in <u>Ray</u>, specifically noting the requirement in several other circuits that plaintiff show "that the employer . . . assigned a non-minority person to her job."

The most definitive Tenth Circuit case on the formulation of the fourth prong of a plaintiff's prima facie case pursuant to <u>McDonnell Douglas</u> is <u>Perry v. Woodward</u>. There, we held that the fourth prong of a plaintiff's prima facie test in a discharge case should be the same as for a failure to hire claim. <u>See</u> <u>Perry</u>, 199 F.3d at 1140. Thus, as in a failure to hire case, a plaintiff alleging discriminatory discharge ordinarily need not show that a person outside of the protected class was hired to fill his former position in order to make out a prima facie case of discrimination.[8] <u>See</u> <u>Perry</u>, 199 F.3d at 1137-38. This is because

_____

[8]Of course, nothing precludes a plaintiff from providing evidence of this nature as part of his prima facie case. It is merely unnecessary for the plaintiff to do so in a discriminatory discharge case. Evidence concerning the treatment of persons outside of the protected class is also appropriately used in assessing whether a plaintiff has shown that the defendant's justification for the discharge was pretextual. <u>See</u> <u>Aramburu</u>, 112 F.3d at 1404; <u>Elmore</u>, 58 F.3d at 530;

(continued...)

- 16 -

comparison to a person outside of the protected class in the fourth prong of the prima facie case is unnecessary to create an inference of discriminatory discharge. See Perry, 199 F.3d at 1140. We explained in Perry:

> When viewed against the backdrop of historical workplace discrimination, an employee who belongs to a racial minority and who eliminates the two most common, legitimate reasons for termination, i.e., lack of qualification or the elimination of the job, has at least raised an inference that the termination was based on a consideration of impermissible factors. The firing of a qualified minority employee raises the inference of discrimination because it is facially illogical to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement.

Id.; see also Crawford, 713 F.2d at 588 ("[T]here is no reason to apply a stricter version of the fourth part of the McDonnell Douglas test in a suit alleging a discriminatory discharge rather than a discriminatory failure to hire or promote."). In short, Perry made clear that the elements of a prima facie case are the same in hiring and discharge cases.

### 2. Application

Relying on our decisions in Flasher, Aramburu, and Elmore, the district court erroneously required Kendrick to show: (1) he is a member of a protected class; (2) he was discharged for violating a work rule; and (3) Penske treated

[8](...continued)
McAlester, 851 F.2d at 1261.

- 17 -

similarly-situated nonminority employees differently. Although the district court found that Kendrick had established a prima facie case, the district court erred in requiring Kendrick to show that Penske treated similarly-situated nonminority employees differently in order to do so. Under Perry, Kendrick need only show that: (1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge. See Perry, 199 F.3d at 1138.

The district court's error was, however, harmless because Kendrick made out a prima facie case under the Perry standard. As a black man, Kendrick clearly meets the first prong. We find that the second and third prongs were met in this case because Penske never challenged Kendrick's assertion that he was qualified for his position as a truck driver nor does Penske dispute that Kendrick was discharged. As for the fourth prong, the record reflects that two drivers were hired in March after Kendrick had been fired. Although the record does not show that either of these drivers were specifically hired to fill Kendrick's position, cf. Perry, 199 F.3d at 1140 (finding that it was undisputed that after plaintiff's termination, a replacement was hired to fill plaintiff's position), these hires do indicate that Penske was not downsizing at the time Kendrick was discharged and we deem this evidence sufficient to satisfy the fourth prong of a prima facie case.

In conclusion, we find that Kendrick has succeeded in putting forth a prima facie case of discharge.

**B.      Facially Nondiscriminatory Justification for Discharge**

Under the <u>McDonnell Douglas</u> burden-shifting paradigm, Penske must then give a facially nondiscriminatory reason for firing Kendrick.  Penske asserts that Kendrick was discharged for gross insubordination after Clyde Cash, Penske's Regional Human Resources Manager, concluded that Kendrick verbally abused and had physical contact with a supervisor based upon uncontroverted information he obtained from Levine.  As explained above, Levine had informed Cash that "Tirrell indicated that Kendrick had cursed him and bumped him with his (Kendrick's) chest and had asked 'Do you want a piece of me?'"  Kendrick does not dispute that Cash made the decision to fire Kendrick.  We therefore find that Penske has met its burden of providing a facially nondiscriminatory reason for firing Kendrick.

**C.      Pretext**

We have previously held that if a plaintiff  "presents evidence that the defendant's proffered reason for the employment decision was pretextual–i.e. unworthy of belief, the plaintiff can withstand a summary judgment motion and is entitled to go to trial."  <u>Randle v. City of Aurora</u>, 69 F.3d 441, 451 (10th Cir. 1995); <u>see</u> <u>also</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, –U.S.–, 120 S. Ct.

2097, 2109 (2000) (holding that "a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability" under the ADEA). Significantly, "[t]he evidence which [a plaintiff] can present in an attempt to establish that [a defendant's] stated reasons are pretextual may take a variety of forms. . . . [A plaintiff] may not be forced to pursue any particular means of demonstrating that [a defendant's] stated reasons are pretextual." Patterson, 491 U.S. at 187-88. A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false, see, e.g., Cole, 43 F.3d at 1380-81 (finding that evidence supporting the conclusion that the defendant's reason for the nonrenewal of plaintiff's employment contract was false was sufficient for plaintiff to survive summary judgment); (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances, see, e.g., Mohammed, 698 F.2d at 400-01 (finding that departure from employment criteria set out in job announcement so as to disadvantage minority employee seeking promotion was probative of discrimination); or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse

employment decision affecting the plaintiff.[9]  A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.  See Aramburu, 112 F.3d at 1404.[10]

Kendrick makes two arguments in support of his claim that Penske's justification for Kendrick's discharge is pretextual.  Kendrick argues that the reasons for his termination were false–that he did not, in fact, push Tirrell.  In the alternative, Kendrick argues that similarly-situated nonminority employees were not discharged for equally egregious conduct.

### 1.    False Justification for Termination

Kendrick contended in his deposition and affidavit that he never had physical contact with Tirrell.  Kendrick argues that this evidence demonstrates that Penske's reason for his discharge is unworthy of belief.

---

[9]This court has noted, however, that where "the alleged procedural irregularity disadvantaged all potential applicants" for a promotion, rather than just members of a protected class, the fact that a company failed to follow its own procedures "does not suggest either that the defendant's proffered reasons for its employment decisions were pretextual or that the defendant was motivated by illegal discrimination."  See Randle, 69 F.3d at 454 n.20.

[10]Of course, direct evidence of discrimination is also adequate to create a genuine dispute regarding pretext.

We assume for purposes of this case that Kendrick's statement that he did not push Tirrell would create a genuine issue of fact as to whether or not Kendrick in fact pushed Tirrell. However, a challenge of pretext requires us to look at the facts as they appear to the person making the decision to terminate plaintiff. See Shorter, 188 F.3d at 1209 (noting that it is the manager's perception of the employee's performance, and not the employee's subjective evaluation of her performance, that is relevant in determining pretext); McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998) (finding that plaintiff failed to establish pretext where the defendant discharged plaintiff after conducting an investigation into a subordinate employee's allegations of sexual misconduct on the part of the plaintiff and believed the allegations to be true, even though plaintiff presented evidence to the district court that the allegations may have been false); Flasher, 986 F.2d at 1312 n.12 ("[A] mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual."). The undisputed evidence shows that Cash decided to terminate Kendrick based on his belief that Kendrick pushed Tirrell and then verbally abused him. There was no evidence before Cash to suggest that Kendrick had not, in fact, made physical contact with Tirrell. Kendrick conceded during his deposition that Tirrell told Levine during the meeting that Kendrick had "charged

him and pushed him and cursed him out," and he testified that he never disputed the charge before Levine.

Other circuits have recognized that a defendant may be held liable if the manager who discharged the plaintiff merely acted as a rubber stamp, or the "cat's paw," for a subordinate employee's prejudice, even if the manager lacked discriminatory intent. See, e.g., Long v. Eastfield College, 88 F.3d 300, 307 (5th Cir. 1996); Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051, 1057 (8th Cir. 1993); Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 1990). In this case, however, Kendrick does not argue that Cash was simply a rubber stamp or conduit for an employment decision made in reality by underlings. The evidence shows that Cash did not simply act as a conduit for Tirrell's allegedly discriminatory intent. Rather, Levine conducted an investigation into Tirrell's claim that Kendrick shoved him and verbally abused him, and Cash relied on Levine's findings in deciding to terminate Kendrick's employment at Penske. Importantly, in the course of his investigation, Levine asked Kendrick to give his version of the exchange between himself and Tirrell, but Kendrick declined to do so. Kendrick has provided no evidence to show that Levine's investigation was a sham or that Tirrell's allegedly discriminatory motives influenced Levine, nor does Kendrick offer any evidence that Levine or Cash acted upon a discriminatory

motive in their own right.[11]  The undisputed evidence shows that Cash discharged

Kendrick based on Levine's report that Kendrick had pushed and verbally abused

Tirrell on March 8.  We therefore conclude that Kendrick's assertion that he did

not, in fact, have physical contact with Tirrell is not sufficient to establish pretext

in this case.

### 2.    Treatment of Similarly-Situated Employees

As explained above, a plaintiff may also show pretext on a theory of

disparate treatment by providing evidence that he was treated differently from

other similarly-situated, nonprotected employees who violated work rules of

comparable seriousness.  An employee is similarly situated to the plaintiff if the

---

[11]Kendrick stated in his deposition that he did not give his version of the story because he believed that there would be no point in doing so.  Kendrick explained that he believed Levine and Tirrell had conspired to put together a story against him before they met with Kendrick and Hill.  In his affidavit, however, Kendrick said that he did not give his own version of the events because there was no one from the union to represent or protect his interests.  Kendrick explained that Hill is not a union representative designated to represent employees in disputes with Penske.

We need not resolve this discrepancy because neither assertion is sufficient to cast doubt on the validity of the investigation.  Kendrick's subjective belief that Levine and Tirrell were conspiring against him is insufficient to create a genuine issue of material fact concerning Levine's allegedly discriminatory motives.  See Aramburu, 112 F.3d at 1408 n.7 ("[S]ubjective belief of discrimination is not sufficient to preclude summary judgment.").  In addition, Kendrick's claim that he did not wish to speak at the meeting because a union representative was not present is irrelevant in light of the fact that there is no evidence to show that Kendrick communicated this desire to Levine at the time of the meeting.  Although Kendrick states in his brief on appeal that he did tell Levine, this assertion is not supported by the record.

employee deals with the same supervisor and is subject to the "same standards governing performance evaluation and discipline." Aramburu, 112 F.3d at 1404 (internal quotations and citation omitted). "A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." Id.

Not every difference in treatment, of course, will establish a discriminatory intent.

> Title VII does not make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal. It prohibits only intentional discrimination based upon an employee's protected class characteristics. Human relationships are inherently complex. Large employers must deal with a multitude of employment decisions, involving different employees, different supervisors, different time periods, and an incredible array of facts that will inevitably differ even among seemingly similar situations . . . .
> What the law does require is that an employer not discriminate against an employee on the basis of the employee's protected class characteristics.

Flasher, 986 F.2d at 1319. Differences in treatment that are trivial or accidental or explained by a nondiscriminatory motive will not sustain a claim of pretext. See id. at 1320.

In support of his contention that Penske disciplined similarly-situated, nonminority employees differently when they violated work rules of comparable seriousness, Kendrick points to a number of instances where employees swore at

their supervisors but were not terminated by Penske. These events cannot be used to show pretext in Kendrick's case, however, because these employees did not violate work rules of comparable seriousness to Kendrick. At the time Cash decided to discharge Kendrick, he understood that Kendrick had physically pushed Tirrell in addition to verbally abusing him. Thus, the fact that other Penske employees may have verbally abused their supervisors but were not discharged does not establish pretext in this case because Kendrick's actions constituted violations of greater severity.

Kendrick does, however, provide evidence of one employee who, although he violated a work rule that is arguably of comparable seriousness, was not fired. The record shows that on the morning of October 27, 1998, a Penske truck driver, Lynn Taylor, threatened a Corporate Express driver with a crow bar. Taylor met with supervisor Rusty Swarts to discuss the incident. Swarts told Taylor that he was suspended pending a further investigation. In response, Taylor stormed out of the office. Taylor then went back into the office, pointed at Swarts and said, "see you later." Swarts asked Taylor to come back into the office and explained to him that he would terminate Taylor on the spot if Taylor was threatening him. Taylor then clarified, "I meant later, you know, when we discuss the matter further." Taylor was again suspended on September 10, 1998, after he verbally abused Warehouse Supervisor, Shane Steadman. On November 13, 1998, Penske

agreed to allow Taylor to keep his job, without retroactive pay, if he would agree to view anger aggression videos and serve a six-month probationary period with complete adherence to corporate policies. Taylor would be terminated if any major violations of corporate policy occurred.

There are several problems with the evidence concerning Penske's treatment of Taylor that prevent us from concluding that Kendrick has demonstrated that a genuine issue of material fact exists as to whether Penske's asserted reason for discharging Kendrick was pretextual. First, Taylor and Kendrick's situations are factually distinguishable. While Penske's treatment of Taylor and Kendrick is close enough to be comparable, see Elmore, 58 F.3d at 530 ("When comparing the relative treatment of similarly situated minority and non-minority employees, the comparison need not be based on identical violations of identical work rules; the violations need only be of 'comparable seriousness.'"), their circumstances were nonetheless different in significant respects. Kendrick actually had physical contact with the person he was threatening while Taylor did not. While from a legal standpoint it would seem that assault with a deadly weapon is just as threatening as pushing another person in anger, we are reluctant to require Penske to view Kendrick and Taylor's actions as equally unacceptable. A company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of

conduct. "Our role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments." Simms, 165 F.3d at 1330 (quotations and citation omitted).

In addition, Taylor and Kendrick did not have the same immediate supervisor. We recognize that Cash, Penske's Regional Human Resources Manager, played a role in determining the disciplinary action to be taken against both Taylor and Kendrick. However, the fact that Taylor and Kendrick each threatened a different intermediate-level supervisor diminishes the evidentiary value of the comparison between Penske's treatment of the two employees. Different supervisors will inevitably react differently to employee insubordination.

Two other important factors distinguish Taylor and Kendrick's situations. In Taylor's case, a number of meetings were held among union representatives, Penske representatives, and Taylor during the course of Penske's investigation into Taylor's conduct. At two of these meetings, union representative Dennis Speaks defended Taylor's character. Speaks assured Penske that, based on his and Taylor's many years of association, Taylor was "a stand up guy" and that Taylor would "walk the straight and narrow" in the future. At the final meeting, Penske representatives, union representatives, and Taylor all made presentations. At this meeting, all parties agreed to the conditions of Taylor's continued

employment described above. In contrast, the union did not defend Kendrick's character or provide assurances that Kendrick would not engage in insubordination in the future. In addition, and perhaps more importantly, Kendrick, unlike Taylor, did not justify his conduct or otherwise make any conciliatory gestures toward his supervisor or Penske.

The fact that Penske took relatively severe disciplinary action against Taylor also diminishes the persuasive value of this comparative evidence. Had Taylor's conduct been dismissed by Penske with a "slap on the wrist," evidence of Taylor's treatment would more strongly support Kendrick's claim that Penske's decision to fire him for insubordination was pretextual. The record reflects, however, that Penske felt Taylor's conduct was very serious, and the company disciplined him accordingly.

Further, the fact that the Taylor incident occurred more than a year and a half after Penske's decision to terminate Kendrick also weakens its evidentiary value. Employers' disciplinary practices necessarily change over time, and it would be inappropriate for courts to penalize employers who have modified their practices over a substantial period of time in an effort to better address their business needs. See Hardy v. S.F. Phosphates Ltd. Co., 185 F.3d 1076, 1082-83 (10th Cir. 1999) (declining to find pretext in an ADEA case where the plaintiff alleged that his employer had previously disciplined younger employees less

severely for harassing their coworkers where the record reflected that the company "took a more serious stance" against harassment following those events).

In sum, the undisputed facts in this case indicate that there were substantial differences between Taylor and Kendrick's circumstances. Adding up these differences and the other deficiencies in the evidence of Taylor's treatment, we conclude that Kendrick has not put forth sufficient evidence to create a genuine issue of material fact on the issue of pretext, and we conclude that the district court did not err in granting summary judgment for Penske on Kendrick's discriminatory discharge claim.

## II. Retaliation Claim

A plaintiff establishes a prima facie case of retaliation by showing: (1) he or she engaged in protected opposition to discrimination; (2) he or she was subject to adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. See Perry, 199 F.3d at 1141 n.12.

Kendrick asserts that Penske discharged him in retaliation for engaging in protected opposition activity in violation of § 1981 and that the district court erred in dismissing these claims. Kendrick claims that Penske retaliated against him for filing numerous complaints with the management at Penske over the course of his employment concerning the unfair treatment of black employees. In

the alternative, Kendrick alleges that Penske retaliated against him for filing the union grievance relating to his suspension.

With respect to the first claim, we find that Kendrick has failed to establish a prima facie case because he has not demonstrated a causal connection between his complaints to the management about the treatment of black employees and his termination. In his brief on appeal, Kendrick points to the following occasions when he complained to Penske management as the basis for his retaliation claim: (1) a complaint in September 1996 concerning sexual harassment of one employee by another to which Kendrick was a witness; (2) a complaint in 1996 about a racially derogatory remark made by one employee about another; and (3) complaints Kendrick made throughout the course of his employment at Penske concerning his belief that blacks were denied opportunities for promotion. We find that Kendrick has not established a causal connection between his discharge and the 1996 complaints concerning the sexual harassment problem and the racially derogatory remark because the complaints were remote in time. See Bullington, 186 F.3d at 1320 ("The causal connection may be shown by producing evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." (citation and quotations omitted)). Similarly, Kendrick does not indicate when he complained to management concerning the denial of promotions to blacks, and we therefore

conclude that he has also failed to establish a causal connection between these complaints and his discharge.

Kendrick further argues that Penske retaliated against him for filing the union grievance he filled out on March 12.[12] However, Kendrick cannot show that Penske had knowledge of the grievance before Penske decided to discharge Kendrick. The letter sent to Kendrick informing him that he was being discharged was dated March 10. In addition, Cash stated in his affidavit that he made the decision to discharge Kendrick on March 10. Kendrick does not contradict this evidence. Thus, the decision to discharge Kendrick pre-dated his filing of the union grievance by two days. We therefore find that Kendrick has failed to make a prima facie showing on this retaliation claim.[13]

For the foregoing reasons, we AFFIRM the order of the district court granting summary judgment to Penske.

---

[12]The grievance stated: "A white driver has argued with management, and slammed doors in their faces while cursing, and nothing was said or done by management. A white driver would curse Tom Johnson out on a regular basis, and nothing was done."

[13]Moreover, it is not clear that Kendrick asserted rights under § 1981 in his union complaint. If he was asserting rights only under the collective bargaining agreement, this would not constitute protected activity upon which a claim of retaliation could be predicated. See McKenzie v. Renberg's Inc., 94 F.3d 1478, 1486 (10th Cir. 1996).