Barbara J. KELLY–KOFFI, Plaintiff,

v.

**WESLEY MEDICAL CENTER,** Defendant.

No. 01–1276–JTM.

United States District Court, D. Kansas.

Jan. 13, 2003.

---

Pantaleon Florez, Jr., Topeka, KS, for plaintiff.

Lynn D. Preheim, Stephanie N. Scheck, Stinson, Morrison, Hecker LLP, Wichita, KS, for defendant.

## MEMORANDUM ORDER

MARTEN, District Judge.

Plaintiff Barbara Kelly–Koffi has brought the present claim of race discrimination in violation of 42 U.S.C. § 1981 against her former employer, Wesley Medical Center. Wesley has now moved for summary judgment. After reviewing the arguments and the evidence, the court concludes that the defendant's motion will be granted.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The uncontroverted facts establish that Wesley employed Kelly–Koffi from No-

vember 2, 1998 to August 26, 1999 as an RN in the Surgical Intensive Care Unit (SICU). Kelly–Koffi had previously worked for Wesley from 1986 until 1994, when she voluntarily left her employment at Wesley to pursue travel nursing. During her first period of employment, Beverly White, the Department Director of Nursing Critical Care Services, was Kelly–Koffi's direct supervisor and had promoted her to a clinical advisor position.

As the Department Director of Nursing Critical Care Services, White's responsibilities included the supervision of the SICU, the Medical Intensive Care Unit (MICU), 2 Tower, 8 Tower, the Hyperbaric Unit, Trauma Services, and the Float Pool. In 1998, Kelly–Koffi contacted White about coming back to work for Wesley. According to Kelly–Koffi, White told her that Wesley would hire her.

Patricia Edwards was the Manager of SICU at the time of Kelly–Koffi's employment in 1998 and 1999. Edwards reported to White. Edwards interviewed Kelly–Koffi and recommended to Wesley's Professional Practices Committee that she be hired.

As part of her employment with Wesley, Kelly–Koffi understood that she was responsible for the integrity and accuracy of Wesley's documents and records. She also understood that various regulatory and legal documents required Wesley to maintain accurate documents and records.

Wesley's policy regarding "Medication Administration" provides, in part, that an RN or LPN "shall assure that all medications scheduled within the tour of duty are administered appropriately." Further, the policy provides that an RN or LPN "shall assure that medications are appropriately scheduled on the Medication Administration Record (MAR) and on the information in the handheld computer." (Def. Exh 5).

Kelly–Koffi understood that accurate documentation is an important aspect of nursing and is something she was trained on during her nursing education. She also understood Wesley's policy regarding medication documentation requiring medication to be charted promptly by the RN or LPN who administered the medication. She knew it was Wesley's policy that medications should be administered within thirty minutes of the scheduled time.

> Wesley's "Code of Conduct" policy regarding controlled substances provides that: Many of these [controlled] substances are governed and monitored by specific regulatory organizations and must be administered by physician order only. It is extremely important that these items be handled properly and only by authorized individuals to minimize risks to us and to patients.

(Deft. Exh. 7, Dep. Exh. 26 at 10). On November 2, 1998, Kelly–Koffi signed an acknowledgment form certifying that she had received the Code of Conduct and understood that it represented mandatory policies of Wesley.

Wesley's practice regarding wasting of narcotics that are ordered but not given to a patient requires nurses to have someone else witness and document the wastage.

On February 25, 1999, Kelly–Koffi received a written counseling for practice concerns, including a narcotics documentation issue, which is documented on a Constructive Action Form. The form raised several issues. First, with respect to patient care, the Form identified the following practice concerns: (1) an insulin drip had expired; (2) a Levophed drip had expired; (3) the morphine drip was running at the wrong rate (a narcotic documentation issue); (4) the chest tube was not suctioning; (4) no water was in the water seal chamber; and (5) blue dye was noted

on top of the suction line. Second, the Form identified additional practice concerns: (1) medication had been ordered but not administered; (2) CBC was not drawn; (3) the patient's temperature had not been documented for 8 hours; and (4) Kelly–Koffi's handwriting was illegible on the neurological portion of the patient chart so that you could not determine what the patient's pupils looked like.

As reflected in the Constructive Action Form, Edwards advised Kelly–Koffi that these issues created a big concern regarding her practice. Edwards counseled Kelly–Koffi that she needed to be more thorough, to finish her work before leaving, and to be more attentive to the ordered regimens. The counseling was written due to the number of errors that had occurred. Edwards advised Kelly–Koffi that improvement was expected immediately.

Kelly–Koffi admits that she engaged in the conduct that she was written up for on the February 25, 1999 Constructive Action Form. She further admits that these were legitimate concerns.

On May 14, 1999, Kelly–Koffi received a written counseling for mislabeling a lab on two occasions. Edwards prepared a Constructive Action Form regarding the incident and met with Kelly–Koffi to discuss this issue. Kelly–Koffi admits that she engaged in the conduct that she was written up for on the May 14, 1999 Constructive Action Form.

On August 9, 1999, Kelly–Koffi received a written reprimand for narcotic documentation discrepancies and falsification of a medical record. The Constructive Action Form prepared in connection with the reprimand reflects issues reported by two Hospital Notification Systems ("HNS") forms. An HNS is a form used to report any situation that the risk manager needs to be notified of. Edwards prepared the Constructive Action Form and met with Kelly–Koffi to discuss these issues.

The Constructive Action Form involved first, discrepancies in the times and amounts of narcotics checked out and the times and amounts narcotics were administered, and second, falsification of a medical record. Specifically, Kelly–Koffi documented that she had checked the pedal pulses on the leg of a diabetic patient, who had already lost one leg due to the diabetes, when she did not in fact check the pedal pulses as documented. Kelly–Koffi admits that she engaged in that conduct described in the Form.

The Form reflects that Edwards told Kelly–Koffi that immediate improvement in documentation and accurate handling of narcotics was required, and that each of these incidents was reportable to the State Board of Nursing.

Kelly–Koffi's subjective belief is that the August 9, 1999 write-up was racially motivated. She believes that since "there was no harm [to the patients,] it's extremely petty." (Plf. Dep. at 124–126). She also believes that she was being dealt with in an unfair manner because she received the Constructive Action Forms.

She believes that another employee, Rhonda Smith, was trying to weed her out by reporting these issues. She also thinks that Smith was trying to weed out two white employees as well, that Ms. Smith viewed Kelly–Koffi and the two white employees as threats to her (Smith), and that Ms. Smith's input into Kelly–Koffi's performance contributed to her termination.

As Department Director, part of White's responsibilities was to review all written Constructive Action Forms. White had reviewed all Constructive Action Forms involving Kelly–Koffi. Because of the seriousness of the issues raised by the August 9, 1999 Constructive Action Form, Ed-

wards met with White to discuss how to respond to the practice concerns involving Kelly–Koffi. After reviewing Kelly–Koffi's file, White told Edwards to conduct a random chart review of Kelly–Koffi's patients to determine if a bigger narcotic documentation problem existed. Edwards pulled 14 charts to review, and discovered multiple examples of poor nursing practices that had not been discovered when Edwards gave Kelly–Koffi the August 9, 1999 reprimand. There is a dispute about whether the additional incidents discovered in Edwards' investigation directly affected the safety of any patient. However, it is uncontroverted that the investigation did reveal multiple instances of improper documentation, and that these errors were not acceptable and were poor nursing practice.

For example, the plaintiff does not controvert that the chart review showed a failure to properly document the amount and time narcotics were given, including a failure to document wastage; charting administration of narcotics in amounts not ordered by a physician; and, charting with illegible handwriting making it difficult to determine whether the narcotics were properly administered.

Edwards has testified that if she had been aware of the extent of the pattern of practice concerns discovered during the chart review at the time of the August 9, 1999 reprimand, she would have terminated Kelly–Koffi instead of giving her a reprimand.

Kelly–Koffi has acknowledged that her handwriting on the charts was difficult to read.

At the same time Edwards reviewed Kelly–Koffi's charts, she also reviewed charts of other nurses under her supervision to make sure Kelly–Koffi was being fairly evaluated compared to the practices of her peers. Although in her affidavit Kelly–Koffi identifies instances of alleged errors by other nurses in their documentation of medication, she fails to specify that those errors were serious, regular, and known to Edwards. It is uncontroverted that, of the discrepancies discovered during Edwards' chart review, those involving other nurses were not the same severity of Kelly–Koffi's narcotic documentation discrepancies.

Edwards reported her findings to White. White reviewed the information Edwards prepared of the chart review and the prior Constructive Action Forms. Based upon this information, and in consultation with Kay Willis, the Chief Nursing Officer, White made the decision to terminate Kelly–Koffi's employment. Wesley terminated Kelly–Koffi for multiple documentation discrepancies with regard to narcotics.

During the same time period of Kelly–Koffi's termination, White was involved in the decision to terminate two other employees in her line of supervision for narcotic documentation discrepancies and errors. A nurse in MICU was terminated on August 5, 1999 for incorrect and incomplete narcotic documentation. A nurse in the Float Pool was terminated on September 10, 1999 for narcotic documentation discrepancies. Both of these nurses are white. White has testified that, based on her review of the narcotic documentation discrepancies involving all three employees, Kelly–Koffi's narcotic documentation discrepancies were comparable or more severe than the other two employees' documentation discrepancies.

Kelly–Koffi believes she was terminated because of her race. In her response to the motion for summary judgment, Kelly–Koffi stresses that she made no additional errors in the period she was employed after August 9, 1999. She stresses that none of the patients involved in the earlier errors actually overdosed on morphine.

She also disputes the details of some of the specific instances of the earlier documentation discrepancies.[1]

However, it is uncontroverted that there were a number of documentation discrepancies. Further, it is uncontroverted that the additional review revealed a substantial number of other discrepancies. While none of these discrepancies actually injured any patient, it is uncontroverted that the discrepancies reflected unsafe nursing practice.

The defendant argues that summary judgment is appropriate because Kelly–Koffi has failed to present a prima facie case of discrimination, and because even if such a case existed, it terminated her employment for a legitimate business purpose. In light of the uncontroverted facts in the case, the court concurs with defendant's arguments, and finds that plaintiff has failed to present a triable case of discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ It is uncontroverted that investigation by Wesley revealed numerous instances of discrepancies in the documentation of narcotic medications dispensed by Kelly–Koffi. Kelly–Koffi does not deny that errors were made, and there is no evidence that this pattern of errors was satisfactory to the employer Wesley. To the contrary, it is uncontroverted that the errors reflected unacceptably unsafe nursing practice. The full pattern of discrepancies was not known to Wesley on August 9, 1999, when Kelly–Koffi was counseled and told not to make further similar errors. There is no evidence to contradict Edwards' direct testimony that, had she known on August 9 of the pattern of discrepancies later revealed by the investigation, she would have immediately terminated Kelly–Koffi. Because plaintiff has failed to establish that she was qualified for her position and meeting Wesley's legitimate expectations, she has failed to demonstrate a prima facie case of discrimination. *See Kendrick v. Penske Transp. Services*, 220 F.3d 1220 (10th Cir.2000).

■ Further, even assuming plaintiff had made out a prima facie case of discrimination, summary judgment is appropriate because Wesley had a legitimate reason to terminate her employment, and there is no evidence that that reason is pretextual. The defendant has provided evidence that the reason it terminated Kelly–Koffi's employment was her serial errors in documenting the dispensation of narcotic medications. The defendant's evidence establishes that these errors reflect unsafe and unacceptable nursing practice.

There is no evidence that this rationale is a pretext for discrimination. There is

---

1. Kelly–Koffi also suggests that such errors were common among the nurses. With a single exception, the evidence cited by Kelly–Koffi indicates at most only that other nurses made the occasional error in documentation. The exception is Kelly–Koffi's statement in her affidavit, filed in response to the summary judgment motion, in which she states that another specific nurse made errors in documentation "almost daily" and that the supervisor Edwards "was observed to give daily counseling" to the nurse about such errors. (Plf. Aff. at ¶¶ 25–26). Even beyond the absence of any evidence about the gravity of the alleged errors made by this other nurse, Kel-

ly–Koffi's affidavit is directly contrary to her deposition testimony, in which she unequivocally testified that she had no personal knowledge of how Edwards treated the other nurses regarding documentation errors, because any discussion of that was conducted in private. The plaintiff's deposition testimony is not ambiguous, and the plaintiff makes no attempt to explain the discrepancy between the deposition and the affidavit. Accordingly, the allegations advanced in the affidavit on this subject are disregarded, and form no part of the factual findings herein. *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986)

no evidence that Wesley has tolerated similar errors by other employees. To the contrary, other, white nurses who were found to have made repeated errors in medication documentation have also been dismissed by Wesley. The defendant had a legitimate business purpose in terminating the plaintiff, and summary judgment will be granted.

IT IS ACCORDINGLY ORDERED this _____ day of January, 2003, that the defendant's Motion for Summary Judgment (Dkt. No. 31) is hereby granted.