**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 6 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

GILBERT SALGUERO,

      Plaintiff-Appellant,

v.

THE CITY OF CLOVIS,

      Defendant-Appellee.   .

No. 03-2120

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-02-0319 WJ/LCS)

Eric D. Dixon of Portales, New Mexico, for the Plaintiff-Appellant.

Jerry A. Walz, (Anthony (T.J.) J. Trujillo with him on the brief), Walz and Associates, Cedar Crest, New Mexico for the Defendant-Appellee.

Before **LUCERO**, **BALDOCK** and **TYMKOVICH**, Circuit Judges.

**LUCERO**, Circuit Judge.

Gilbert Salguero, a former City of Clovis police officer, was terminated from his employment after an investigation uncovered his involvement in obtaining illegal access to satellite television. He filed suit in federal district court alleging that the City of Clovis (the "City"): (1) breached his employment

contract by terminating him without just cause; (2) dismissed him without due process of law in violation of 42 U.S.C. § 1983; and (3) intentionally discriminated against him on the basis of race in violation of 42 U.S.C. § 1981. The district court granted the City's motion to dismiss as to several of Salguero's claims and granted summary judgment to the City as to the remainder. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **AFFIRM**.

**I**

In April 2001, the City of Clovis Police Department ("CPD") received information that police officers were involved in obtaining cards to access satellite television illegally. CPD initiated a criminal investigation and interviewed all officers with satellite televisions. Based on the investigation, CPD concluded that although several officers were involved in illegally obtaining satellite television, Salguero's involvement was the most severe. In an interview on August 18, 2001, after being read his Miranda rights, Salguero admitted that: (1) he obtained illegal satellite access cards from Canada; (2) he gave cards to a relative, two friends, and Officers Keith Farkas and Roger Dial; and (3) it was common knowledge in CPD that he could assist others in obtaining cards. The CPD police captain recommended that Salguero be terminated due to the severity of his involvement in the satellite scheme. Although Salguero appealed the police captain's recommendation to the deputy chief and the chief of police, he was

terminated in September 2001. Salguero brought post-termination appeals before the city personnel director and the assistant city manager, both of whom upheld the termination.

Having been denied relief on both his pre- and post-termination appeals, Salguero requested a hearing before the city grievance board, which he received on January 18, 2002, before a five-member board. At the hearing, he was represented by counsel and was informed of his right to call and question witnesses and to present other evidence. Salguero argued before the board that his termination was disproportionate compared to the discipline received by other officers, and that it was a result of discrimination. Specifically, he claimed that he was the only Hispanic officer involved in the illegal satellite access scheme and the only officer to be terminated despite the involvement of seven other officers.

Testimony heard by the board included statements that only Salguero and one other officer, Keith Farkas, had distributed cards or received any money for the cards, and that only Salguero had sent money orders out of state to obtain cards and searched at pawnshops for cards to reprogram. Salguero himself admitted that he did not know of anyone in CPD with greater involvement in the illegal activity than his, and that he did not know of any other officers who supplied cards to other officers. In addition, he testified that he provided illegal

cards to four officers, conducted one transaction while on duty, had an agreement with another individual who would reprogram cards for Salguero, and informed others how to obtain cards.

On January 25, 2002, the board issued a decision upholding Salguero's termination. Its findings included the following: (1) Salguero knew his actions violated both state and federal law; (2) no other CPD employee was involved in reprogramming or obtaining illegally reprogrammed cards; (3) only one other employee distributed illegal cards as a conduit for Salguero on one occasion; (4) all other employees involved in the use of illegal satellite access cards were end-users or conduits for Salguero; and (5) Salguero was the organizer and solicitor of illegal reprogramming activities.

On March 21, 2001, Salguero filed a complaint in federal court against the City alleging: (1) a state law claim that CPD breached his employment contract by wrongfully terminating him without just cause; (2) a claim under 42 U.S.C. § 1983 that CPD dismissed Salguero, inter alia, without due process of law; and (3) a claim under 42 U.S.C. § 1981 that CPD intentionally discriminated against him on the basis of race. The City filed a motion to dismiss, or in the alternative, a motion for summary judgment on all of Salguero's claims.

In a Memorandum Opinion and Order, the district court denied all of Salguero's claims. With respect to the breach of contract claim, the district court

determined that under the doctrine of collateral estoppel, a New Mexico court would give preclusive effect to findings by the grievance board that Salguero was terminated for just cause; accordingly, it granted summary judgment to the City. As to Salguero's § 1983 claims, the district court dismissed under Fed. R. Civ. P. 12(b)(6) every theory but Salguero's alleged procedural due process violations. On that claim, it granted summary judgment to the City because Salguero failed to establish a violation of his rights to notice and an opportunity to be heard.

Finally, the district court granted summary judgment to the City on Salguero's § 1981 intentional discrimination claim. It also granted summary judgment to the City on Salguero's § 1983 equal protection claim to the extent that it stated a claim. The district court reasoned that under the McDonnell Douglas burden-shifting framework, Salguero's "conclusory statements in his own affidavit that [] other employees engaged in conduct of comparable seriousness" failed to demonstrate that the City's legitimate reasons for his termination were pretextual. Salguero v. City of Clovis, No. 02-319 WJ/LCS, slip. op at 33 (D.N.M. April 22, 2003).

Salguero appeals on two grounds: (1) the grievance board was not an adjudicative body that presented him with a full and fair opportunity to litigate the issue of just cause; and (2) he presented genuine questions of fact establishing that the City's reasons for his termination were pretextual.

## II

We review a summary judgment grant de novo and apply the same legal standard used by the district court. McCowan v. All Star Maint., Inc., 273 F.3d 917, 921 (10th Cir. 2001). Drawing all reasonable inferences in the light most favorable to the nonmoving party, see Simms v. Oklahoma ex rel., 165 F.3d 1321, 1326 (10th Cir. 1999), summary judgment is appropriate "if the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We also review de novo the district court's application of the doctrine of collateral estoppel. Dodge v. Cotter Corp., 203 F.3d 1190, 1197 (10th Cir. 2000); see also Gonzales v. Hernandez, 175 F.3d 1202, 1204 (10th Cir. 1999) (similarly reviewing de novo a grant of summary judgment on the ground that the claims were barred under the doctrine of collateral estoppel).

## A

With respect to his contract claim, Salguero argues that the doctrine of collateral estoppel should not bar him from litigating his claim in federal district court. Salguero raises two primary challenges on appeal: (1) that the decision of the grievance board should not be granted preclusive effect because the board was not acting in a judicial capacity; and (2) that the board did not afford him a full

and fair opportunity to litigate his breach of contract claim.

Applying the principles of collateral estoppel, or issue preclusion, to decisions of state administrative bodies serves to promote federalism, conserve judicial resources, and encourage parties to minimize the expense and burden of repetitive litigation. See Univ. of Tenn. v. Elliot, 478 U.S. 788, 798 (1986). Thus when a state agency (1) acts in "a judicial capacity"; (2) resolves "disputed issues of fact properly before it"; and (3) the parties have had "an adequate opportunity to litigate" the issue, we will grant the state agency's decision preclusive effect to the extent that it would have received preclusive effect in state court. Id. at 799 (quotation omitted).

Therefore, if a New Mexico state administrative hearing satisfies Elliot's three requirements, we look to New Mexico law to determine whether issue preclusion is proper. New Mexico courts apply collateral estoppel to administrative hearings provided: "(1) the party against whom collateral estoppel is asserted [was] a party in or in privity with a party to the original action; and (2) the two cases [] concerned the same ultimate issue of fact, which was (a) actually litigated, and (b) necessarily determined in the first suit." DeLisle v. Avallone, 874 P.2d 1266, 1269 (N.M. Ct. App. 1994). If the party invoking the doctrine provides sufficient evidence to meet all elements of this test, it establishes a prima facie case. See Shoveline v. Central New Mexico Electric Cooperative,

Inc., 850 P.2d 996, 1000 (N.M. 1993).  At that point, the "burden shifts to the party opposing collateral estoppel to show that he or she was not afforded a full and fair opportunity to litigate the issue in the prior proceeding."  Padilla v. Intel Corp., 964 P.2d 862, 865 (N.M. Ct. App. 1998).

Salguero's first challenge on appeal concerns the predicate under Elliot that state administrative bodies must act in a "judicial capacity."  478 U.S. at  798.  He contends that the grievance board is authorized only to uphold, overrule, or modify the termination and thus lacks the authority to determine a breach of contract claim.  However, New Mexico law authorizes municipalities to create personnel boards to administer municipal ordinances, N.M. Stat. Ann § 3-13-4(A), which control the "contract of employment between the municipality and an employee," § 3-13-4(C).  Applying this statute in Zamora v. Village of Ruidoso Downs, 907 P.2d 182, 184–85 (N.M. 1995), the New Mexico Supreme Court held that a personnel board was authorized to hear breach of implied employment contract claims.  See N.M. Stat. Ann § 3-13-4(A).   It also explained that a state administrative body acts in quasi-judicial capacity when it is "required to investigate facts, or ascertain the existence of facts, hold hearings, and draw conclusions from them, as a basis for their official action . . . ."  Zamora, 907 P.2d at 185 (quotation omitted).  Because the grievance board held a hearing and made findings pursuant to state statutory authority to consider Salguero's

- 8 -

employment contract claim, we conclude that it acted in a judicial capacity.

Salguero's second challenge concerns whether he had a fair and full opportunity to litigate his breach of contract claim under New Mexico law. New Mexico law requires the City first to state a prima facie case that collateral estoppel should apply. It is undisputed that Salguero is a party in both actions and that both cases concern the same ultimate issue of fact as to whether Salguero was terminated for just cause. Moreover, the district court held, and we agree, that the issue of just cause was actually litigated and necessarily decided by the board "in its determination that Plaintiff's termination was justified and appropriate based on Plaintiff's violations of City policy, department policy, state law, federal law, and his oath of office." Salguero, slip. op at 14.

Because the City established its prima facie case, the burden shifts to Salguero to proffer controverting facts showing that he did not have a full and fair opportunity to litigate his breach of contract claim. To this end, Salguero argues on appeal that his hearing was procedurally deficient because: (1) he was not afforded an opportunity to conduct discovery prior to the hearing; (2) he was unable to subpoena certain witnesses, question fully some witnesses who refused to answer all his questions, and seek appellate review of the decision; (3) hearsay evidence was admitted; and (4) members of the grievance board had no legal training.

We have held that an "inquiry into whether a party had a full and fair opportunity to litigate an issue often . . . will focus on whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to litigate fully the issue, or whether effective litigation was limited by the nature or relationship of the parties." Murdock v. UTE Indian Tribe of Uintah & Ouray Reservation, 975 F.2d 683, 689 (10th Cir. 1992) (quotation omitted); see also Padilla, 964 P.2d at 865 (similarly examining a party's incentive to litigate in the administrative forum, procedural differences between the prior and current forums, and policy considerations). In the instant case, Salguero was represented by counsel before the board and had a strong incentive to litigate his breach of contract claim. He was also able to call witnesses, cross-examine witnesses, and present other evidence. See, e.g., Atiya v. Salt Lake County, 988 F.2d 1013, 1019 (10th Cir. 1993) (finding plaintiff had an adequate opportunity to litigate during a hearing where she was represented by counsel, made opening and closing statements, called and cross-examined witnesses, and introduced exhibits).

Salguero fails, moreover, to explain how the procedural deficiencies of which he complains impeded his ability to litigate his breach of contract claim fully and fairly before the grievance board. For example, he did not develop a record that showed what facts discovered in federal litigation, witness testimony,

or documentary evidence relevant to his breach of contract claim were not previously presented and considered by the board. In the absence of such evidence, and in light of the procedure he was afforded, we conclude that Salguero was able to fully and fairly litigate his claims.

Salguero also contends his opportunity to litigate was inadequate because the City's policy manual indicated that the board should consist of eleven (rather than five) members and, moreover, four of the five members present were subordinates of the city manager who prosecuted the case for the City. Neither of these arguments persuade us that the grievance board was improperly constituted or deprived Salguero of a full and fair opportunity to litigate his contract claim. The personnel code requires only a five-member grievance board. New Mexico State law authorizes municipalities to adopt codes by ordinances, see N.M. Stat. Ann. 1978 § 3-17-6(A), and to establish by ordinance personnel boards—including the method of appointment, the number of members, and terms of office—to administer employment decisions, see § 3-14-4 (B). Because the personnel code, unlike the policy manual, was enacted pursuant to city ordinance, it reasonably controls the number of members of the grievance board. As to Salguero's claim of bias, we have reasoned that the mere presence of internal employees on personnel boards, without evidence that they have a personal or financial stake in the decision, does not establish bias. See, e.g., Tonkovich v.

Kansas Bd. of Regents, 159 F.3d 504, 519-20 (10th Cir. 1998). Salguero presented no evidence of actual bias or the appearance of bias. Thus, we agree with the district court that Salguero had a full and fair opportunity to litigate his claim that his employment contract was breached without just cause, and we affirm the grant of summary judgment to the City on this issue.

**B**

As to Salguero's § 1981 employment discrimination claim and § 1983 civil rights claims, which Salguero alleges to have included an equal protection claim,[1] he argues on appeal that a genuine question of fact exists as to whether CPD's reasons for his termination were a pretext for race discrimination. We evaluate the merits of both the §§ 1981 and 1983 claims pursuant to the stepwise allocation of burdens of proof set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Randle v. City of Aurora, 69 F.3d 441, 450 (10th Cir. 1995) (explaining that where city officials are authorized to make final employment

---

[1] The district court dismissed Salguero's equal protection argument for failure to state a claim under Fed. R. Civ. P. 12(b)(6), and, in the alternative, granted summary judgment to the City on the equal protection claim. The City argues that because Salguero appeals only the district court's grant of summary judgment and failed to challenge the district court's Rule 12(b)(6) dismissal, he has waived his right to challenge both the 12(b)(6) dismissal and the court's alternative grant of summary judgment on the equal protection claim—thus barring our consideration of the merits of the claim. However, we need not and do not address this question, "because the case may be more easily and succinctly affirmed on the merits." Miller v. Mullin, 354 F.3d 1288, 1297 (10th Cir. 2004) (quotation omitted).

decisions such as hiring and termination, the City can be held liable for discriminatory decisions under §§ 1981 and 1983 pursuant to the McDonnell Douglas test); see also, Drake v. City of Fort Collins, 927 F.2d 1156, 1162 (10th Cir. 1991) ("[T]he elements of a plaintiff's case are the same, based on the disparate treatment elements outlined in McDonnell Douglas, whether that case is brought under §§ 1981 or 1983 or Title VII.").

To prevail on a claim alleging termination on the basis of race, Salguero must first establish a prima facie case, demonstrating that: (1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination. See Martin v. Nannie & the Newborns, Inc., 3 F.3d 1410, 1416–17 (10th Cir. 1993) (applying the McDonnell Douglas test to a wrongful termination claim). If Salguero meets his burden of establishing a prima facie case, the burden shifts to the City to articulate a legitimate, nondiscriminatory reason for the termination that is "not facially prohibited by Title VII." EEOC v. Flasher Co., Inc., 986 F.2d 1312, 1317 (10th Cir. 1992). If the City satisfies this standard, the burden shifts back to Salguero to provide evidence showing that the City's proffered reasons are a pretext for racial discrimination. Id. at 1319.

It is undisputed that Salguero made a prima facie showing of discrimination. In response, the City proffers the following legitimate,

- 13 -

nondiscriminatory reasons for Salguero's termination: (1) Salguero knowingly engaged in illegal activity; (2) he assisted others in engaging in illegal activity; (3) he solicited the assistance of others in the illegal activity; and (4) he engaged in more severe conduct than other CPD employees who engaged in the illegal activity. Because these reasons are not "facially prohibited by Title VII," Flasher, 986 F.2d at 1317, we agree with the district court that the City has articulated a legitimate, nondiscriminatory reason for terminating Salguero.

Thus, we proceed to the third step of the McDonnell-Douglas framework, in which we must determine whether Salguero countered the City's articulated non-discriminatory reasons for firing him by providing specific facts showing that CPD's reasons for its decision are pretextual or racially motivated. See McDonnell Douglas, 411 U.S. at 804; Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1317 (10th Cir. 1999). Summary judgment in favor of the City is warranted only if Salguero has "failed to produce any evidence from which a reasonable inference could be drawn" that the City's proffered reasons were pretextual. Foster v. AlliedSignal, Inc., 293 F.3d 1187, 1196 (10th Cir. 2002) (quotation omitted).

Typically, a plaintiff may show pretext in one of three ways: "(1) with evidence that defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company

- 14 -

policy prescribing the action taken by the defendant under the circumstances; or (3) with evidence that . . . . he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000). Salguero attempts to show pretext on a theory of disparate treatment by providing evidence that he was treated differently from other similarly-situated non-Hispanic employees whose involvement in the illegal satellite access scheme was of comparable seriousness. Specifically, he argues that other officers distributed satellite cards, and that one officer possessed a machine for reprogramming satellite cards.

Although Salguero makes numerous assertions about the conduct of other officers in his own affidavit, in determining whether the City's proffered reasons for its decision were pretextual, we must examine "the facts as they appear to the person making the decision to terminate [Salguero]." Kendrick, 220 F.3d at 1231; see also, Flasher, 986 F.2d at 1322 n.12 ("[A] mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual.") (citation omitted); Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1209 (10th Cir. 1999) (noting that the manager's perception of employee's performance, rather than the employee's own evaluation of his or her performance, is relevant in determining pretext). In Kendrick, for example, a supervisor stated that an African American

employee had physically assaulted and cursed at him. However, because that employee did not attempt to dispute the charges at the time of his termination, we concluded that the employee's subsequent arguments before the district court—that other employees had cursed at their supervisors without termination, and that the plaintiff employee had not, in fact, had any physical contact with his supervisor—were insufficient to show pretext. 220 F.3d at 1231–32. In so holding, we reasoned that the employee was fired because the facts known to the decision maker at the time the employee was terminated indicated that the employee had both cursed at and physical assaulted his supervisor. Id.

Applying Kendrick[2] to the facts at hand the district court held:

[t]he facts known to the Board Members at the time Plaintiff was terminated indicated that Plaintiff's conduct was more severe than that of other CPD employees.[3] This was in large part based on Plaintiff's own testimony at the hearing that no other CPD employees had more involvement than Plaintiff in the illegal activity, and no other employees supplied satellite access cards to others within CPD. The fact that Plaintiff now asserts that the facts are different than

[2] Salguero's attempts to distinguish Kendrick—that unlike in the instant case, the entire infraction occurred on the job and in close temporal proximity to the adverse employment action—are irrelevant to pretext analysis.

[3] We reject Salguero's contention on appeal that this conclusion required consideration of the decision maker's intent, improper on summary judgment.

they appeared at the time of the hearing does not show pretext and Plaintiff has failed to meet his burden of presenting evidence from which a reasonable jury could conclude that Defendant's proffered nondiscriminatory reason for Plaintiff's termination is unworthy of belief.

Salguero, slip. op at 33.

On appeal, Salguero's most compelling argument in support of a theory of disparate discipline is that CPD's own investigative report, testimony before the board, and interviews with Salguero indicate that: (1) Officer Al Lewis boasted he could connect people with illegal cards; (2) Officer Keith Farkas possessed a machine for making satellite cards, which he disposed prior to the investigation; (3) Officer Max Stansell received a card from Farkas; and (4) Farkas acted as a conduit between Salguero and other officers, specifically by assisting Officer Chris Kinley in obtaining an illegal card with Salguero's assistance.

Even reading all facts and inferences in a light most favorable to Salguero, however, the evidence leading up to the hearing before the board demonstrates that Salguero's conduct was the most severe and culpable. Although Farkas' conduct is certainly serious, the facts remain that no other CPD employee was involved in reprogramming, obtaining illegally reprogrammed cards, or ordering cards from Canada. We afford substantial latitude to employers in making

discipline related decisions, and are reluctant to "act as a super personnel department that second guesses employers' business judgments." Simms, 165 F.3d at 1330 (quotation omitted). Because the facts indicate significant differences in conduct among the officers under investigation, Salguero's allegations of disparate discipline do not suffice to show pretext.[4]

Salguero's remaining attempts to show pretext are equally unpersuasive. He argues generally that his work environment was discriminatory. To that end, he presents the affidavit of a former employee alleging that the deputy chief of police (who upheld the termination recommendation) made a racial comment on an unspecified date between September 2000 and December 2002; however, Salguero fails to demonstrate a persuasive nexus between the statement and his firing. See Shorter, 188 F.3d at 1210. Salguero also proffers his own affidavit alleging disparate salary between himself and a comparable white employee, that unlike white officers, he received second-hand equipment, and that Hispanic

---

[4] Salugero also outlines in his affidavit five instances where named white officers were not terminated for violating laws, including domestic battery, spray-painting graffiti, killing an endangered species, and shooting and killing a dog while intoxicated. However, these assertions are not supported in the record nor does Salguero's affidavit demonstrate any personal knowledge or corroborating evidence, and, as such, are insufficient to create a genuine question of material fact as to pretext. See, e.g., Murry v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (requiring that to survive summary judgment a nonmovant's affidavit must be "based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient") (quotation omitted).

officers were made to do "translation work" without any extra compensation. (R. at 175–76.) He alleges further that although the investigating officer knew of the satellite television scheme for several years, the officer initiated an investigation in retaliation for Salguero's refusal to pick his son for Salguero's Little League team. Such conclusory allegations—lacking evidentiary support in the record—do not suffice to create a genuine question as to whether the City's work-related reasons for Salguero's termination were a pretext for discrimination. Moreover, like Title VII, §§ 1981 and 1983 do not "make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal. It prohibits only intentional discrimination based upon an employee's protected class characteristics." Flasher, 986 F.2d at 1319.

Finally, Salguero seeks to establish pretext by showing that CPD acted contrary to its own written policies by: (1) initially interviewing him without reading him his Miranda rights, in the absence of counsel, and without recording the interview; (2) releasing information about the investigation to a third party; and (3) disciplining him for off-duty activities. However, as the City argues, CPD's investigative reports do not reveal that any officers under investigation were afforded such procedures; moreover, several officers were disciplined for off-duty conduct, and there is no evidence that the release of information pertained specifically to Salguero. Thus, such arguments are not probative of

pretext. See Kendrick, 220 F.3d at 1230 n.9 (stating when the defendant's failure to follow its own procedures disadvantages all employees rather than just members of a protected class, such failure does not establish pretext or motivation of illegal discrimination). Because we agree with the district court that Salguero has failed to demonstrate that the City's reasons for his termination were a pretext for race determination, we affirm the grant of summary judgment to the City on this issue.

## III

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.