**F I L E D**
United States Court of Appeals
Tenth Circuit

**July 14, 2005**

**PATRICK FISHER**
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

_____

RITA L. MACKENZIE,

      Plaintiff-Appellant,

v.

      No. 02-1468

DENVER, CITY AND COUNTY OF, a
municipal corporation; DEPARTMENT OF
HEALTH & HOSPITALS, an agency of the
executive branch of the City and County of
Denver,

      Defendants-Appellees.

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 97-RB-2378 (OES))**

_____

Barry D. Roseman, Roseman & Kazmierski, LLC, Denver, Colroado, for Plaintiff-
Appellant.

R. Craig Hess, Assistant City Attorney (Helen Eckardt Raabe, City Attorney, and Karla J.
Pierce, Assistant City Attorney, with him on the briefs) for Defendants-Appellees.

_____

Before **HARTZ, McKAY** and **O'BRIEN**, Circuit Judges.

_____

**O'BRIEN**, Circuit Judge.

_____

Rita MacKenzie (MacKenzie) appeals from a grant of summary judgment in favor of her former employer, the City and County of Denver (the City). MacKenzie alleges the City discriminated against her because of her disability in violation of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101, *et. seq.* She also alleges the City discriminated on the basis of her age by (1) disparate disciplinary treatment; (2) denying her a promotion; and (3) retaliating against her for protected activities, all in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et. seq.* Finally, MacKenzie contends she was subjected to a hostile work environment and constructively discharged from her employment. For the reasons stated below and exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. Background

### A. MacKenzie's Employment

At the time she filed her complaint in the district court, MacKenzie, a white female, was 64 years old.[1] She began work with the City at the Denver Health and Hospital Authority in March 1986. In November 1988, she began work as a clinic clerk and receptionist at Denver Health's Infectious Diseases Clinic (ID Clinic).[2] Supervised by Patrick Gourley (Gourley), the nursing program manager, MacKenzie was expected to answer telephones in a professional and courteous manner, treat patients and visitors of

---

[1] MacKenzie filed her complaint on November 5, 1997.

[2] The ID Clinic provides heath care to patients who are HIV positive or suffer from AIDS.

2

the clinic with respect, and exercise good interpersonal skills with co-workers, patients and the public. According to her annual performance evaluations, MacKenzie succeeded, scoring above-average (strong) ratings from 1990 through 1993. In 1994, however, MacKenzie only received a "meets expectations" rating, suggesting only a satisfactory performance. A year later, on July 5, 1995, MacKenzie's annual performance slipped even lower when she received a "below expectations" rating. Her evaluations suggested MacKenzie's declining performance was tied to an apparent increase in rudeness toward staff and patients.

Specifically, in the fall of 1994, three patients, a nurse, and a number of physicians, social workers and other clinic staff complained to Gourley regarding MacKenzie's rudeness. This resulted in a verbal reprimand from Gourley on October 28, 1994.[3] MacKenzie denied ever being rude.[4] As a follow-up, Karen Martinez (Martinez), clerical staff supervisor, and Mari Rogers (Rogers), Gourley's direct supervisor, counseled MacKenzie on her communication skills.

On November 18, 1994, MacKenzie filed a grievance with the City's personnel department alleging Gourley had made inappropriate age-related remarks. In particular, MacKenzie alleged that between March 1993 and November 9, 1994, Gourley subjected her to a series of derogatory, age-related remarks, calling her "an old lady," "senile" and

---

[3] There are indications in the record that MacKenzie's etiquette was in need of improvement from the outset of her employment.

[4] In fact, in response to every complaint made against her, MacKenzie denies being rude.

3

"slow." In addition to comments concerning her general age, MacKenzie also claims that a patient told her Gourley said if anything went wrong in the clinic, "[j]ust blame Rita." (R. at 277.)

While an investigation confirmed MacKenzie's account of the events, it also revealed she leveled a number of age-related comments towards Gourley, calling him an "old man" and commenting about his gray hair. MacKenzie admitted to making such comments. The grievance was denied by the department director. MacKenzie appealed that decision, but her appeal was rejected as untimely.[5] Even so, Rogers instructed Gourley never to make comments about MacKenzie's age even if she attempted to engage in bantering. Rogers also arranged for Gourley to apologize to MacKenzie in the presence of Rogers and another witness. By MacKenzie's own account, Gourley never again made inappropriate comments. In fact, for some months later, Gourley refrained from communicating with MacKenzie at all, which precipitated another grievance by MacKenzie filed on February 23, 1995. She was also active in the interim.

On December 16, 1994, MacKenzie filed a grievance against Gourley, alleging retaliation for her November 1994 grievance against him. Gourley's alleged retaliation took the form of re-arranging MacKenzie's office furniture (apparently increasing the glare on her computer screen) and temporarily adjusting her work schedule for the forthcoming Christmas holiday season, which "interfered" with her afternoon exercise routine. According to the City, Gourley merely adjusted MacKenzie's desk forty-five

_____

[5] MacKenzie was allowed ten days to appeal. She filed her appeal on the tenth day after she received the decision letter rather than on the tenth day after it was issued.

4

degrees to accommodate patient flow from the treatment area to the restroom. As to the increased glare on her computer screen, the City promptly installed a glare-reduction screen, which, by MacKenzie's own admission, helped alleviate the problem. With regard to MacKenzie's complaint about her schedule being changed, the City asserts it was done to accommodate a co-worker's absence during the holiday season. The City, however, offered MacKenzie several options to accommodate her exercise routine, including expanding her lunch breaks to allow her to exercise and permitting her to take "walking breaks" during the day.

On December 22, 1994, Rogers again counseled MacKenzie on her substandard communication skills. A week later, on January 3, 1995, Gourley received two more complaints about MacKenzie's rude behavior, this time from a patient and his physician. Before any discipline was meted out for these latest complaints, Gourley received yet another complaint. This complaint, received January 24, 1995, concerned MacKenzie's treatment of a clinic patient. A follow-up investigation confirmed her rudeness toward this patient and, on February 16, 1995, MacKenzie was issued a written reprimand for her behavior.

On March 20, 1995, Rogers and Martinez met with MacKenzie to discuss her interpersonal problems. On March 29, 1995, MacKenzie filed a formal charge of discrimination against the City with the EEOC alleging age and disability discrimination, wrongful denial of promotion, retaliation and harassment.

Two more complaints concerning MacKenzie's rudeness were received from

5

patients on May 9, 1995, and May 22, 1995. A follow-up investigation into these complaints confirmed MacKenzie's unprofessional behavior.[6] MacKenzie was offered an opportunity to explain her side of the story on June 23, 1995. MacKenzie was suspended on June 29, 1995, effective July 6, 1995, for her misconduct related to the May 22, 1995 complaint.

On June 8, 1995, another patient complaint was filed against MacKenzie. On September 15, 1995, MacKenzie was given an opportunity to respond to these charges. On October 11, 1995, MacKenzie was suspended for her misconduct relating to this latest complaint.

MacKenzie, in a consolidated appeal to the City, sought review of both her "below expectations" performance evaluation rating and one-day suspension, arguing they were the product of Gourley's harassment and retaliation toward her. On December 5, 1995, after reviewing MacKenzie's various grievances, the hearing officer concluded she had failed to establish her poor performance evaluation was the product of harassment or retaliation by Gourley. The hearing officer also concluded the City took the appropriate steps in progressively disciplining her and her suspension was justified.

On September 1, 1995, Rogers and Martinez transferred MacKenzie to the Tuberculosis Clinic (TB Clinic). Her new supervisor, Marybeth O'Neil, observed a new diligence in MacKenzie's work and on May 2, 1997, promoted her to senior support services clerk. Some time after her promotion, however, new complaints about

---

[6] On June 21, 1995, MacKenzie was instructed to attend a customer relations course on August 23, 1995.

MacKenzie's behavior surfaced, this time from patients who had no contact with those in the ID Clinic. Specifically, on October 9, 1998, MacKenzie received a verbal warning for being rude with a patient on the telephone, and on October 29, 1998, MacKenzie was issued a written reprimand for inappropriate behavior with a patient.[7] MacKenzie ultimately resigned on December 28, 1998: the resignation became effective January 1, 1999.

## B. MacKenzie's Request for Promotion

In November 1993, a specialty clerk position opened up in the administration department of Denver Health. While still at the ID Clinic, MacKenzie applied for the position. The particular job responsibilities included (1) processing employee requisitions, (2) processing payroll and performing payroll-related tasks, and (3) keeping track of travel-related matters. Despite MacKenzie's past payroll experience, Martinez did not offer her the position. Instead, Rosalinda Romero, a younger candidate, was chosen. The City claims it chose Romero because of (1) her strong work ethic, (2) her experience in materials management/payroll -- precisely the type of experience sought for the position, (3) her proficient interpersonal skills, and (4) the fact she had previously worked in the same department.[8] Because she did not receive the promotion, MacKenzie included a failure-to-promote claim in her March 29, 1995 discrimination charge to the

---

[7] In response, MacKenzie's supervisors asked that she attend another customer skills class, which she refused to do.

[8] MacKenzie concedes she had never worked as a payroll clerk for the City and her previous payroll experience was over ten years prior to her application for the specialty clerk position.

EEOC.

## C. MacKenzie's Disability

In 1990, MacKenzie suffered an angina attack[9] and in 1993, a heart attack. Despite those circumstances, MacKenzie admits she was able to perform her job without restrictions and was capable of performing an entire class of jobs, evidenced by her repeated applications for various specialty clerk positions without requesting an accomodation.[10] Moreover, MacKenzie concedes she was able to walk, care for herself, and handle manual tasks, including engaging in an exercise regimen three days a week. Nevertheless, MacKenzie included a disability discrimination claim in her March 1995 EEOC charge based on her heart condition.[11]

## D. Procedural History

MacKenzie filed charges of discrimination with the EEOC on March 29, 1995, and again on April 8, 1999, for which she received right to sue notices on September 3, 1997,

---

[9] Angina is chest pain or discomfort that occurs when the heart muscle does not receive enough blood.

[10] According to MacKenzie's March 29, 1995 discrimination charge to the EEOC, she applied for speciality clerk positions in 1994 with the City's Department of Public Health (two separate instances); Department of Public Works; Department of Excise and Licenses; Department of Revenue -- Motor Vehicle Division; Department of Health and Hospitals; Department of Environmental Services (two separate positions); and Department of Fire -- Personnel Office.

[11] In MacKenzie's Affidavit submitted as an exhibit to her brief in opposition to Defendants' Motion for Summary Judgment, she avers a six-month bout with depression allegedly caused by her work situation. However, prior to this appeal she did not connect her depression to her disability claim.

and on May 6, 1999, respectively.[12]  In her March charge of discrimination, MacKenzie alleged she was denied various promotions by the City in violation of the ADEA and the ADA.  In particular, she claimed she was denied a promotion in retaliation for the grievance she filed against Gourley for comments he made regarding both her age and disability.  She also alleges the retaliation did not end there but extended to (1) receiving a lower than expected rating on her performance evaluation, (2) the reconfiguration of her work station, and (3) having her work schedule temporarily changed.  In her May charge, MacKenzie alluded to the disability of coronary disease and again alleged the City violated both the ADEA and the ADA by retaliating and discriminating against her in the form of various disciplinary actions, ultimately leading to her constructive discharge.

MacKenzie filed suit on November 5, 1997, initially alleging she was discriminated against because of her age and disability and suffered retaliation for opposing employment practices she believed to be unlawful.  On September 15, 1998, the City filed a motion for summary judgment.  It was denied on March 15, 1999.  On August 5, 1999, MacKenzie filed her First Amended Complaint which included a constructive discharge claim in addition to her previous allegations.  The City renewed its motion for summary judgment on September 15, 2000.  Before a decision was reached on the motion, the case was reassigned to a different district judge on March 14, 2002.  On

---

[12] Originally, MacKenzie asserts she filed a charge of discrimination with the EEOC on January 20, 1995.  However, upon order of this Court to provide proof of her EEOC charges, MacKenzie states no such charge exists.  We draw no inferences from a non-existent charge.

9

September 17, 2002, in a two-page order, the district court granted the City's motion for summary judgment, simply adopting and incorporating "the arguments advanced by the defendants in their motion and reply in support of summary judgment."  (R. at 391-92.)

## II.  Discussion

### A.  Standard of Review

We review a grant of summary judgment *de novo*.  *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1182 (10th Cir. 1995).  An important function of summary judgment is to eliminate factually unsupported claims.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *Id.* at 323.  "We consider the 'factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'"  *Rohrbaugh v. Celotex Corp.*, 53 F.3d at 1182-83 (quoting *Blue Circle Cement, Inc. v. Bd. of County Comm'rs.*, 27 F.3d 1499, 1503 (10th Cir. 1994)); *see also* Fed. R. Civ. P. 56(c).  "Summary judgment is appropriate if the non-moving party cannot adduce probative evidence on an element of its claim upon which it bears the burden of proof."  *Rohrbaugh,* 53 F.3d at 1183.  "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  Once the movant demonstrates no genuine issue of material fact, the nonmovant is given "wide berth to prove a factual controversy exists."  *Jeffries v. Kansas, Dep't of Soc.*

10

*& Rehab. Servs.*, 147 F.3d 1220, 1228 (10th Cir. 1998) (quotation omitted). Unsupported conclusory allegations, however, do not create an issue of fact. *Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004). Finally, in addition to the above, we remain "free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994).

We are provided minimal assistance by the district court's verbatim adoption of one party's proposed findings of fact and conclusions of law, but this does not change the standard of review. *Flying J Inc. v. Comdata Network Inc.*, 405 F.3d 821, 830 (10th Cir. 2005). "Though not made by the district judge himself, the findings 'are formally his, they are not to be rejected out-of-hand, and they will stand if supported by evidence.'" *Id.*, quoting *United States v. El Paso Nat. Gas Co.,* 376 U.S. 651 (1964).

## B.  Disability Discrimination

### 1.  Failure to Exhaust Administrative Remedies

In the tenth circuit, a plaintiff must exhaust her claims before the EEOC as a prerequisite to federal court jurisdiction over her ADA claims. *See Jones v. Runyon*, 91 F.3d 1398, 1399 n.1 (10th Cir. 1996); *Khader v. Aspin*, 1 F.3d 968, 970-71 (10th Cir. 1993). A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC. *Ingels v. Thiokol Corp.*, 42 F.3d 616, 625 (10th Cir. 1994); *Martin v. Nannie & Newborns, Inc.*, 3 F.3d 1410, 1416 n.7 (10th Cir. 1993)

11

(overruling on other grounds recognized by *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1184-85 (10th Cir. 2003)); *Bryant v. Bell Atlantic Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). Liberally construed, MacKenzie's charges of discrimination with the EEOC regarding her disability identify only one disability: coronary disease. For the first time on appeal, however, MacKenzie asserts she has a second disability, depression. Beyond the fact that her second alleged disability plainly exceeds the scope of her EEOC charge, we refuse to consider arguments raised for the first time on appeal. *Vitkus v. Beatrice Co.*, 127 F.3d 936, 946-47 (10th Cir. 1997). Consequently, we consider only MacKenzie's avowed coronary disease when addressing her disability claim.[13]

## 2. The Merits

To prevail on her ADA claim, MacKenzie must establish: (1) she is a disabled person as defined by the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) her employer discriminated against her because of her disability. *Butler v. City of Prairie Vill.*, 172 F.3d 736, 748 (10th Cir. 1999). Since there is no direct evidence of discrimination, the analytical framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), guides our review of MacKenzie's ADA claims.

---

[13] In addition, while the EEOC charges of discrimination speak of retaliation and failure to promote, MacKenzie waited until her response to the City's motion for summary judgment to include a claim that she was refused an accommodation to attend to her exercise routine while at the TB Clinic. It is unclear whether MacKenzie has preserved this claim on appeal. In any event, because MacKenzie failed to allege a failure to accommodate claim in her original EEOC charge, she failed to exhaust her administrative remedies as to this claim and it is dismissed. *See Jones v. Sumser Ret. Vill.,* 209 F.3d 851 (6th Cir. 2000).

*Butler*, 172 F.3d at 747; *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). In the summary judgment context, a plaintiff initially must raise a genuine issue of material fact on each element of the prima facie case. *Butler*, 172 F.3d at 747. If a plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its employment decision. *Id.* Should the defendant articulate a nondiscriminatory reason, the burden shifts back to plaintiff to show a genuine issue of material fact as to whether defendant's reason for the discharge is pretextual. *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1079-80 (10th Cir. 1999). We conclude MacKenzie has failed to establish the first two elements of her prima facie case.

### (a) Disabled Individual

The statute defines disability as either (1) a physical or mental impairment that substantially limits one or more of an individual's major life activities, 42 U.S.C. § 12102(2)(A); (2) a record of such an impairment, 42 U.S.C. § 12102(2)(B); or (3) being regarded as having such an impairment, 42 U.S.C. § 12102(2)(C). An analysis under 42 U.S.C. § 12102(2)(A) requires a three-step process: (1) we consider whether MacKenzie's heart condition is a physical impairment, (2) we identify the life activity upon which she relies and determine whether it constitutes a major life activity under the ADA, and (3) we ask whether the impairment substantially limited the major life activity. *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). "[W]hether a claimed affliction constitutes an impairment under the ADA and whether the identified endeavor constitutes a major life

activity are determinations of law for the court to decide." *Poindexter v. Atchison, Topeka & Santa Fe Ry. Co.*, 168 F.3d 1228, 1230 (10th Cir. 1999).

Turning to step one, we observe the City does not dispute MacKenzie has a heart condition. Therefore, jury could reasonably conclude, even without expert medical testimony, that MacKenzie had a condition affecting the cardiovascular system constituting a physical impairment under the ADA. *See* 29 C.F.R. § 1630.2(h)(1) ("Physical or mental impairment means: [ ] any physiological disorder, or condition...affecting one or more of the following body systems: . . . cardiovascular. . . .").

As to the second element, MacKenzie must precisely identify a major life activity affected by her impairment. *Poindexter*, 168 F.3d at 1232. Close inspection of the record and the pleadings reveals MacKenzie claims her cardiovascular impairment limits the major life activities of (1) physical exertion (unable to lift over 50 pounds) and (2) stress-related work. Her contention that physical exertion constitutes a major life activity is wholly without merit. Mere physical exertion (except to the extent it affects one's ability to work) does not constitute a major life activity under the ADA. *Cf.* 29 C.F.R. § 1630.2(i) ('Physical exertion' is not within the genus of those listed as a major life activity); *see also Croy v. Cobe Lab., Inc.*, 345 F.3d 1199, 1204 (10th Cir. 2003) (We declined to recognize multiple sclerosis as a substantial impairment of a life activity where the plaintiff, among other things, could not bear 'sustained exertion.').

14

We next consider MacKenzie's claim that the major life activity of working is limited because she must avoid some unknown level of stress. In accordance with EEOC regulations, this court has recognized "working" as a major life activity. *Bristol v. Bd. of County Comm'rs*, 281 F.3d 1148, 1161 (10th Cir. 2002), *rev'd in part on other grounds*, 312 F.3d 1213 (10th Cir. 2002) (en banc).[14] However, to establish that one is disabled, one must show that one is "significantly restricted" in performing a major life activity "as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). In addition, in any claim where working constitutes a major life activity, a plaintiff must demonstrate she is unable to perform either a class of jobs or a broad range of jobs in various classes. *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117,1134 (10th Cir. 2003) (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491-492 (1999)). No such showing has been made here. Indeed, the record reveals the opposite.[15] Moreover, MacKenzie's entire disability claim focuses on the actions of her supervisor Gourley. However, the major life activity of working cannot be "substantially impaired" if a plaintiff cannot work under a certain supervisor because of the stress and

---

[14] The Supreme Court has repeatedly questioned whether "working" should even qualify as a major life activity. *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 200 (2002) ("Because of the conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as much, and we need not resolve this difficult question today."); *Sutton v. United Air Lines, Inc*., 527 U.S. 471, 492 (1999) (identifying "some conceptual difficulty in defining major life activities to include work" but assuming without deciding that working is a major life activity).

[15] *See* note 10, *supra*.

15

anxiety it causes. *Siemon v. AT&T Corp.*, 117 F.3d 1173, 1176 (10th Cir. 1997) (citing *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524-25 (7th Cir. 1996)).

Based on the above, we conclude as a matter of law that MacKenzie has not demonstrated an impairment to a major life activity. Therefore, MacKenzie has failed to establish the first prong of her prima facie case, that she is a disabled person under the ADA.

*(b) Discrimination Based on Disability*

Finally, as part of a prima facie case, MacKenzie must demonstrate she suffered discrimination due to her disability. Despite the fact that MacKenzie, and not the Court, is supposed to state with particularity the kind of discriminatory conduct to which she was subjected, as noted above, we can only make out one instance of supposed discrimination by the City: a temporary work schedule change during the last two weeks of December 1994. Specifically, MacKenzie's work schedule was changed from 7:30 a.m. to 4:30 p.m. to 8:00 a.m. to 5:00 p.m. Because MacKenzie exercised in the evening, she claims the schedule change interfered with her exercise routine, which was aimed at reducing her stress. Assuming the improbable, that such a brief schedule change could suffice as a discriminatory action, we turn to the City's proffered non-discriminatory rationale. The City asserts the reason for MacKenzie's brief schedule change was to cover a vacationing co-worker's shift. And, in response to any adverse impact such a schedule change would have on MacKenzie's exercise routine, the City offered to either (1) allow her the opportunity to exercise at the beginning of the workday; (2) give her walking breaks both

16

in the morning and afternoon; or (3) expand her lunch break to accommodate for her "missed" exercise routine. MacKenzie has failed to present any evidence suggesting the City's proffered rationale for the schedule change was pretextual.[16] Thus, MacKenzie has failed to demonstrate either a prima facie case or that her employer's proffered reason for it s actions was pretextual. Since she must do both, her ADA claim fails.

## C. Age Discrimination

The ADEA was passed "to promote employment of older persons based on their ability rather than age" and "to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b). The Act, in part, prohibits an employer from "fail[ing] or refus[ing] to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In particular, MacKenzie asserts the City violated various provisions of the ADEA by (1) disciplining her more harshly than younger employees for similar conduct under the same supervisor; (2) denying her a promotion and filling the position with a younger, inexperienced individual; and (3) retaliating against her for her protected activities. We consider each of MacKenzie's claims in turn.

### 1. Disparate Treatment

In order to establish a disparate treatment claim under the ADEA, MacKenzie

---

[16] MacKenzie also asserts she suffers from a disability because there is a record of such an impairment. 42 U.S.C. § 12102(2)(B). For the same reasons articulated above, her claim fails.

must set forth a prima facie case of discrimination. *Jones v. Unisys Corp*., 54 F.3d 624, 630 (10th Cir. 1995); *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 612 (1993) (noting that the *McDonnell Douglas* proof standard applies to ADEA claims). Specifically, the requirements of a prima facie claim of disparate treatment require a plaintiff to produce evidence at a minimum establishing (1) she was a member of a protected class, (2) she was disciplined, and (3) she was treated differently than similarly-situated non-protected employees for the same or similar conduct. *See, e.g., Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995); *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992). Individuals are considered "similarly-situated" when they (1) have dealt with the same supervisor; (2) were subjected to the same work standards; and (3) had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Mazzella v. RCA Global Communications, Inc*., 642 F. Supp. 1531, 1547 (S.D.N.Y. 1986), *aff'd*, 814 F.2d 653 (2d Cir. 1987); *see also Lanear v. Safeway Grocery*, 843 F.2d 298, 301 (8th Cir. 1988).

Assuming MacKenzie satisfies the first and second prongs of the prima facie case, we cannot conclude she meets the requirement of the third: that similarly situated younger employees received more favorable treatment.[17] Specifically, MacKenzie designates six employees and "several part time staff" as "comparable" employees. However, two of the named employees engaged in "misconduct" fundamentally distinct from MacKenzie's

---

[17] We here observe that the discipline she received for her repeated violations was not harsh.

conduct (arriving at work late and insubordination). *See Salguero v. City of Clovis*, 366 F.3d 1168, 1177 (10th Cir. 2004) ("Because the facts indicate significant differences in conduct, allegations of disparate discipline do not suffice to show pretext."). Three of the named employees worked under a different supervisor. *See Rivera v. City & County of Denver*, 365 F.3d 912, 922 (10th Cir. 2004) ("Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."). More fundamentally, there is no evidence in the record (other than MacKenzie's speculation) that any of the employees were treated differently for actions they may have committed. *Salguero*, 366 F.3d at 1177 n. 4. Because MacKenzie fails to establish a prima facie claim of disparate treatment, summary judgment was warranted on her ADEA disparate treatment claim.

## 2. Failure to Promote

Invoking the now-familiar three-step burden-shifting analysis mandated by *McDonnell Douglas*, a plaintiff alleging a failure-to-promote claim under the ADEA must initially establish a prima facie case demonstrating: (1) she was a member of a protected class; (2) she applied for and was qualified for the position; (3) despite being qualified she was rejected; and (4) after she was rejected, the position was filled by someone outside the protected class. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000). It is undisputed that MacKenzie established a prima facie case of age discrimination on her claim that she was not promoted in November, 1993.

19

At this stage, the City is required to articulate a legitimate, nondiscriminatory reason for its employment action. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002). The City asserts it chose Romero over MacKenzie*, inter alia,* because of Romero's prior experience in the department, including her experience with the specific type of payroll program used by the City. On the other hand, MacKenzie never worked as a payroll clerk for the City nor had she worked in any kind of payroll position in over ten years. Because the City's reasons are not facially prohibited by the ADEA, the City has articulated legitimate, nondiscriminatory reasons for not promoting MacKenzie.

This shifts the burden back to MacKenzie to proffer evidence demonstrating the employer's reason is pretextual. *Id.* This is typically accomplished by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence. . . ." *Morgan v. Hilti*, 108 F.3d at 1323 (quotation omitted).

MacKenzie charges the City's reasoning was pretextual because (1) her subjective belief is that she was more qualified; (2) Romero had little payroll experience; and (3) the hiring person was aware of MacKenzie's complaints of age discrimination. Taking her contentions in reverse, we observe that MacKenzie's first formal complaint of age discrimination was not filed until some nine months *after* she applied for and was denied the specialty clerk position.[18] Moreover, the City never contended that Romero had more

_____

[18] The position became available in November, 1993, and MacKenzie filed her first greivance in November, 1994.

payroll experience, only that she had relevant and more recent experience. Furthermore, MacKenzie's proffer of being more experienced fails to give rise to a genuine issue of material fact sufficient to ward off summary judgment. *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999); *Simms v. Okla. ex rel. Dept. of Mental Health & Substance*, 165 F.3d 1321, 1329-30 (10th Cir. 1999). Unless the disparity in employees' qualifications are obvious, "we judges should be reluctant to substitute our views for those of the individuals charged with the evaluation duty by virtue of their own years of experience and expertise in the field in question." *Odom v. Frank*, 3 F.3d 839, 847 (5th Cir. 1993). Therefore, MacKenzie's failure to promote claim under the ADEA fails.

### 3. Retaliation

To establish a retaliation claim, MacKenzie must demonstrate she engaged in activity statutorily protected under the ADEA. 29 U.S.C. § 623(d). Such activity includes opposing or complaining about age discrimination by the employer. *Id.* To establish a prima facie case of retaliation, MacKenzie must establish (1) she availed herself of a protected right under the ADEA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the two actions. More specifically, a causal connection is established where the plaintiff presents "'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" *Bullington*, 186 F.3d at 1320 (quoting *Burrus v. United Tel. Co. of Kan., Inc.,* 683 F.2d 339, 343 (10th Cir. 1982)).

21

To gain a clearer sense of MacKenzie's precise claims, we recite them briefly here. MacKenzie asserts that after she filed her grievance against Gourley for his age-related remarks in late November 1994, he retaliated against her by reconfiguring her work station. MacKenzie then filed another grievance complaining of this supposed act of retaliation in December 1994. In response to Gourley's alleged passive treatment of her, MacKenzie filed yet another grievance in February 1995. In response to her "below expectations" job performance rating and her one-day suspension in July 1995, MacKenzie filed an appeal and grievance complaining they were the product of Gourley's "continued age discrimination, retaliation, harassment, mental and psychological suffering. . . ." (R. at 319.) MacKenzie also asserts the City "retaliated" against her when supervisors issued her a verbal reprimand a month after the City filed its first motion for summary judgment in this case and then by issuing her a written reprimand some twenty days later. Finally, MacKenzie asserts the February 13, 1994 decision not to promote her was also motivated by some form of retaliation.

Examining her claims individually, we conclude some lack logic while others lack a basis in law. In particular, we find it incredible that the decision to deny MacKenzie a promotion (although constituting an adverse employment action) was based on her protected activity given that the proffered motive for the denial, MacKenzie's grievance against Gourley, occurred nine months later. We also find it illogical the City would have retaliated against MacKenzie through a verbal and written reprimand after the City filed a motion for summary judgment against her in this case. Moreover, with regard to

22

MacKenzie's claim that Gourley's "silent treatment" towards her was in retaliation for her filing a grievance against him, we conclude mere passive treatment does not constitute an adverse employment action. *See Flannery v. Trans World Airlines, Inc.*, 160 F.3d 425, 428 (8th Cir. 1998) (shunning is not an adverse employment action where the plaintiff did not allege that the ostracism resulted in a reduced salary, benefits, seniority, or responsibilities); *Manning v. Metro. Life Ins. Co.*, 127 F.3d 686, 693 (8th Cir. 1997). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) (quotation omitted). Lastly, MacKenzie's claim that Gourley retaliated by moving her desk forty-five degrees is equally without merit. Even if retaliatory, (unlikely given the explanation), it is de minimis.

Consequently, we are left only to consider whether MacKenzie's "below expectations" job performance rating and one-day suspension, which are adverse employment actions, were retaliatory. We conclude her allegations lack the causation prerequisite. Close inspection of the record unmasks only one possible retalitory motive for these actions: MacKenzie's initial grievance filed eight months prior and/or her subsequent grievances filed five to seven months prior to the alleged retaliation. However, we have held:

> Unless an adverse action is *very closely* connected in time to the protected
> activity, a plaintiff must rely on additional evidence beyond mere temporal

23

proximity to establish causation. A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient.

*Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (quotation omitted). Because we have uncovered nothing aside from her claim of temporal proximity to establish causation, and examining the totality of the evidence before us, which includes numerous references to MacKenzie's rudeness towards fellow workers and patients, we cannot conclude MacKenzie has sufficiently demonstrated that her poor performance rating and one-day suspension were due to her protected activity. Based on the above, MacKenzie's retaliation claim fails.

**D. Hostile Work Environment**

MacKenzie next alleges she was subjected to a hostile work environment because of her age. "For a hostile environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Penry v. Fed. Home Loan of Topeka,* 155 F.3d 1257, 1261 (10th Cir. 1998) (quotation omitted). To evaluate whether a working environment is sufficiently hostile or abusive, we examine all the circumstances, including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance.

24

*Harris v. Forklift Sys., Inc.* 510 U.S. 17, 23 (1993). In addition, the environment must be both subjectively and objectively hostile or abusive. *Id*.; *see also Davis v. U.S. Postal Serv*., 142 F.3d 1334, 1341 (10th Cir. 1998).

The Supreme Court has instructed that courts judging hostility should filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of age-related jokes, and occasional teasing. *See e.g. Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)(sex discrimination). This screening is in place to ensure that Congressional enactments such as the ADEA do not become trivialized as a civility code. *Id*. In particular, courts should filter out offhand comments, and isolated incidents (unless extremely serious).

Applying these principles, we find MacKenzie's allegations fall far short of demonstrating pervasive or severe harassment. The evidence proffered by MacKenzie includes Gourley's (1) passive treatment of her; (2) failure to diligently and timely inform her of complaints made against her; and (3) age-related remarks. Specifically, in considering Gourley's passive treatment of MacKenzie, we cannot conclude that Gourley's supposed silence could be considered hostile given that MacKenzie herself sought this silence when she filed her first grievance against him. With regard to the claim that Gourley was not diligent in communicating complaints to MacKenzie concerning her misconduct, the record reflects that complaints came from every conceivable perspective: physicians, patients and staff, and often came on top of one another. Despite the sheer volume and diverse origins of complaints, MacKenzie does

25

not contend she was denied an opportunity to contest the complaints made against her, only that there was an unspecified lag between the time a complaint was made and the time she became aware of it. The fact remains that MacKenzie was always given an opportunity to respond to the complaints made against her. Thus, merely because MacKenzie was not immediately informed about a particular complaint amounts to no more than "a mere inconvenience." *Dick v. Phone Directories Co.*, 397 F.3d 912, 922 (10th Cir. 2005) (adverse employment action will not be recognized for mere inconvenience in hostile work environment claim); *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004) (sex discrimination); *Sanchez v. Denver Pub. Schs.*, 164 F.3d 1064, 1071 (10th Cir. 1998) (age discrimination).

Finally, we consider Gourley's age-related comments. A thorough review of the record confirms Gourley commented on MacKenzie's lassitude and hot flashes, and that he joked about MacKenzie's senility and being an "old lady."[19] The record also demonstrates, however, that MacKenzie was willing to make age-related comments of her own toward Gourley. Given the kind of mutual bantering that took place here, we cannot conclude the workplace could be considered either objectively or subjectively hostile. Moreover, in response to MacKenzie's complaints, her employer immediately counseled Gourley and required him to make a public apology. The official response was a refusal to tolerate offensive age-related comments, and in fact, the comments ceased. Given

---

[19] A comparison of MacKenzie's November 1994 grievance with Mackenzie's affidavit nearly four years later, which was only offered in response to the City's summary judgment motion, reveals a stark (and convenient) contrast in the number and kind of claimed age-related remarks Gourley made.

these undisputed facts, we conclude that her employer's response was prompt, adequate, and effective as a matter of law. *See Scarberry v. Exxonmobil Oil Corp.*, 328 F.3d 1255, 1258 (10th Cir. 2003). "[I]f we required employers to impose discipline without investigation or to impose excessive discipline, employers would inevitably face claims from the other direction of violations of due process rights and wrongful termination." *Id.* at 1262 (internal quotation omitted). Consequently, MacKenzie's hostile work environment claim also fails.

**E. Constructive Discharge**

Constructive discharge occurs when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit. *Muller v. U.S. Steel Corp.*, 509 F.2d 923, 929 (10th Cir. 1975). A finding of constructive discharge depends upon whether a reasonable person[20] would view the working conditions as intolerable, not upon the subjective view of the employee-claimant. *Irving v. Dubuque Packing Co.*, 689 F.2d 170, 172 (10th Cir. 1982). MacKenzie essentially asserts that the complained of behavior (disciplinary and other related actions) at the ID Clinic re-emerged after being transferred to the TB Clinic, and therefore, she had no choice but to resign.

Taking the events described in the preceding discussions in the light most favorable to MacKenzie, we can discern no actions that alone or collectively would

---

[20] It may be assumed that a reasonable person is one who does not consistently ignore or minimize her own faults while exaggerating the conduct of others and assigning malignant intent to facially benign acts and statements.

27

compel a reasonable person to believe she had no choice but to resign. Both the disciplinary actions and the requirement that she attend customer relations courses were a direct result of MacKenzie's repeated misconduct. In sum, the City's actions may have made MacKenzie unhappy, but "not every unhappy employee has an actionable claim of constructive discharge." *Bolden v. PRC Inc*., 43 F.3d 545, 552 (10th Cir. 1994). Therefore, the district court properly granted summary judgment in favor of the City on MacKenzie's constructive discharge claim.

### III. Conclusion

For the foregoing reasons, the decision of the district court is **AFFIRMED**.